IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KEVIN M. KEEFER & PATRICIA S. KEEFER, | § § § | |
| *Plaintiffs*, | § § | |
| | § | Case No.: 3:20-cv-00836-B |
| v. | § § | |
| UNITED STATES OF AMERICA, | § § | |
| *Defendant*. | § § | |

_____

**UNITED STATES' BRIEF IN SUPPORT OF ITS AMENDED MOTION FOR
SUMMARY JUDGMENT AGAINST PLAINTIFFS
KEVIN M. KEEFER AND PATRICIA S. KEEFER**

_____

Respectfully submitted,

DAVID A. HUBBERT
Deputy Assistant Attorney General

 /s/ Moha P. Yepuri
_____
Moha P. Yepuri
Texas State Bar No. 24046651
Christian A. Orozco
Texas State Bar No. 24107886
U.S. DEPARTMENT OF JUSTICE - TAX
DIVISION
717 N. Harwood St., Suite 400
Dallas, Texas 75201
(214) 880-9767/(214) 880-9757
(214) 880-9741 (Facsimile)
Moha.P.Yepuri@usdoj.gov
Christian.A.Orozco@usdoj.gov

ATTORNEYS FOR UNITED STATES

# **TABLE OF CONTENTS**

Table of Contents ..................................................................................................................... ii
Table of Authorities ............................................................................................................... iv
United States' Brief in Support ............................................................................................... 1
I.           Undisputed Material Facts................................................................................. 2
     A.    Kevin Keefer's Ownership in the Partnership.......................................... 2
     B.    The Partnership Received Verbal and Written Offers to Purchase the Hotel ................ 2
     C.    Keefer Sought to Reduce his Anticipated Tax Liability on the Hotel sale .................... 3
     D.    Keefer and Pi Plan the Donation, Including Planning for the Sale of the Hotel............. 4
     E.    Keefer Assigns a 4% Interest through his various entities to himself............................ 5
     F.    Keefer Purportedly Donates a 4% Partnership Interest to Pi ........................................ 6
     G.    Appraisal Attached to the Keefers' 2015 Tax Return ................................................... 8
     H.    Keefer's Oral Agreement that was a part of his Donation Scheme ............................... 9
     I.    The Keefers' 2015 Tax Return and the IRS' corresponding audit............................... 10
     J.    Three Scenarios Computed by IRS Revenue Agent Amy Dunford............................... 11
II.         Legal Standard................................................................................................ 12
III.       Argument......................................................................................................... 15
   Issue A.    The Keefers' charitable contribution is an anticipatory assignment of income ..... 16
   Issue B.    The Keefers' purported donation of a partnership interest fails the statutory
               substantiation requirements. ...................................................................... 18
          1.   *The IRS properly denied the Keefers' charitable contribution deduction*
             *because their Appraisal valued different property than described in previous*
             *assignments and Form 8283* ...................................................................... 19
          2.   *The IRS properly denied the Keefers' charitable contribution because the*
             *appraiser failed to include his tax identification number* ............................... 21
          3.   *The IRS properly denied the Keefers' charitable contribution because their*
             *CWA neither specified the "exclusive legal control" language nor contained a*
             *merger clause* ............................................................................................. 26
          4.   *The Keefers attempts to excuse their inadequate substantiation are futile* ..... 29
          5.   *The Keefers' citations to IRS employees analyses and audit notes are*
             *irrelevant as to whether the appraisal was sufficient according to the Fifth*
             *Circuit's rulings regarding the de novo standard of review.*.......................... 37
          6.   *IRS Form instructions do not serve as a substitute for Treasury Regulations*
             *regarding the qualified appraisal that the Keefers were required to submit.* 37
   Issue C.    The bargain sale element of this transaction, under 26 U.S.C. §1011(b), applied to
               the Keefers' transactions has different results depending on which issues the
               Keefers or the United States prevail upon........................................................... 38

Issue D.    The doctrine of variance bars any relief to the Keefers if they were to claim that they are entitled to a charitable contribution deduction for making a cash donation to Pi.................................................................................................................. 39

IV.          Conclusion............................................................................................................ 42

# TABLE OF AUTHORITIES

Cases:

*15 W. 17th St. LLC v. Comm'r*, 147 T.C. 557, 564 (2016)..................................27

*Acosta v. Hensel Phelps Constr. Co*., 909 F.3d 723, 730 (5th Cir. 2018) ........................24

*Addis v. Comm'r*., 374 F.3d 881, 887 (9th Cir. 2004) ........................................26

*Alabama By-Prod. Corp. v. Patterson*, 258 F.2d 892, 900 (5th Cir. 1958)......................39

*Alli v. Comm'r*, 107 T.C.M. (CCH) 1082 (T.C. 2014) .............................................25, 32

*Angelus Milling Co. v. Comm'r*, 325 U.S. 293, 297 (1945)........................................40

*Austin v. Kroger Tex., L.P*., 864 F.3d 326, 328 (5th Cir. 2017) ........................................14

*Biggs v. First Nat. Bank of Lubbock*, 808 S.W.2d 232, 237 (Tex. App.—El Paso 1991, writ denied) ..................................................................................................17

*Bombardier Aerospace Corp. v. United States*, 94 F. Supp. 3d 816, 840 (N.D. Tex. 2015), aff'd, 831 F.3d 268 (5th Cir. 2016) ........................................................................14

*Bond v. Comm'r*, 100 T.C. 32, 41 (1993) ................................................................27, 32

*Brinkley v. Comm'r*, 108 T.C.M. (CCH) 499 (T.C. 2014), aff'd, 808 F.3d 657 (5th Cir. 2015)..............................................................................................................35

*Brinkley v. Comm'r*, 808 F.3d 657, 669 (5th Cir. 2015).........................................33, 34

*Bruce v. Comm'r*, 101 T.C.M. (CCH) 1739 (T.C. 2011) .........................................27, 28

*In re Canada*, 574 B.R. 620, 640 (N.D. Tex. 2017) ........................................................33

*Campbell v. Comm'r*, 119 T.C.M. (CCH) 1266,\*9, \*10 n.16 (T.C. 2020)..................19, 26

*Chamberlain v. Comm'r*, 66 F.3d 729, 732 (5th Cir. 1995) ..........................................36

*Consol. Invs. Grp. v. Comm'r*, 98 T.C.M. (CCH) 601 (T.C. 2009) ..................................32

*Conyers v. Merit Sys. Prot. Bd*., 388 F.3d 1380, 1382 n.2 (Fed. Cir. 2004) ...............25

*Crimi v. Comm'r*, 105 T.C.M. (CCH) 1330 (T.C. 2013).................................................33

*Davis v. United States*, No. CA 4-2430, 1977 WL 1172, at \*3 (N.D. Tex. Apr. 12, 1977) ..........................................................................13

*Doe v. United States*, 398 F.3d 686, 690 (5th Cir. 2005)..............................................40

*Dotson v. United States*, GC-87-85-D-O, 1988 U.S. Dist. LEXIS 19486 (N.D. Miss. 1988) ..........................................................................................40

*Detroit Screwmatic Co. v. United States*, 49 F.R.D. 77, (S.D.N.Y. 1970) ......................13

*El Paso CGP Co. v. United States*, 748 F.3d 225 (5th Cir. 2014)....................................40

*Endicott v. Mellon*, 39 F.2d 505 (D.C. Cir. 1930) .........................................................39

*Est. of Evenchik*, 105 T.C.M. (CCH) 1231 (T.C. 2013) ...........................................20, 32

*Emanouil v. Comm'r of Internal Revenue*, 120 T.C.M. (CCH) 146 (T.C. 2020) .............33

*Est. of Hudgins v. Comm'r*, 57 F.3d 1393, 1404 (5th Cir. 1995) ....................................27

*Ferguson v. Comm'r*, 174 F.3d 997, 1003 (9th Cir. 1999)........................................16, 17

*French v. Comm'r*, 111 T.C.M. (CCH) 1241 (T.C. 2016).........................................27, 28

*Gonzalez v. Vill. of W. Milwaukee*, 671 F.3d 649, 661 n.6 (7th Cir. 2012).....................24

*Green v. Comm'r*, 507 F.3d 857, 872 (5th Cir. 2007)....................................................34

*Hatcher v. Comm'r*, 726 F. App'x 207, 218 (5th Cir. 2018)..........................................36

*Hewitt v. Comm'r*, 109 T.C. 258, 261 (1997), *aff'd*, 166 F.3d 332 (4th Cir. 1998) ....24, 32

*Kincaid v. United States*, 682 F.2d 1220, 1222–23 n.3 (5th Cir. 1982)............................12

*King v. United States*, 641 F.2d 253, 259 (5th Cir. 1981) ..................................................13

*Kinzer v. United States*, No. CIV.A. H-02-721, 2002 WL 31959138, at \*7 (S.D. Tex. Dec. 10, 2002)..........................................................................................................23

iv

*Lewis v. Reynolds*, 284 U.S. 281 (1932) ................................................13, 37

*Losantiville Country Club v. Comm'r*, 906 F.3d 468, 476 (6th Cir. 2018).....................35

*Mallette Bros. Constr. Co. Inc. v. United States*, 695 F.2d 145 (5th Cir. 1983)..........40, 41

*McAlpine v. Comm'r*, 968 F.2d 459, 462 (5th Cir. 1992)..............................27, 28

*Millette & Assocs., Inc. v. Comm'r,* 594 F.2d 121, 124 (5th Cir. 1979) ..........................30

*Millsaps v. Thompson*, 259 F.3d 535, 542 n.3 (6th Cir. 2001) ..................................25

*Mohamed v. Comm'r*, 103 T.C.M. (CCH) 1814 (T.C. 2012) ..........................................30

*National Right to Work Legal Defense and Ed. Foundation v. United States*, 487 F. Supp. 801, 805 (E.D. N.C. 1979)...............................................................................13

*Neonatology Assocs., P.A. v. Comm'r*, 115 T.C. 43, 100 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002) ......................................................................................................35

*Nnadika v. Att'y Gen. of U.S.*, 484 F.3d 626, 630 n.3 (3d Cir. 2007)...........................25

*Nat. Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993)................18

*Pankratz v. Comm'r*, 121 T.C.M. (CCH) 1178 (T.C. 2021)..........................................34

*Powers v. Northside Indep. Sch. Dist.*, 951 F.3d 298, 307 (5th Cir. 2020) ....................14

*Prudhomme v. Comm'r*, 345 F. App'x 6, 11 (5th Cir. 2009)...................................35, 36

*R.E. Deitz Corp. v. United States*, 939 F.2d 1, 4 (2d Cir. 1991)................................13

*Richardson v. United States*, 330 F. Supp. 102 (S.D. Tex. 1971) ..................................40

*Rigas v. United States*, 486 F. App'x 491, 499 (5th Cir. 2012).........................................27

*Rodgers v. United States*, 843 F.3d 181, 195 (5th Cir. 2016). ......................................39

*Salty Brine I, Ltd. v. United States*, 761 F.3d 484, 491 (5th Cir. 2014).................16, 17, 18

*Schwier v. Cox*, 340 F.3d 1284, 1288 (11th Cir. 2003) ..................................................25

*Seely v. Comm'r*, 51 T.C.M. (CCH) 1087 (T.C. 1986)..................................................30

*Sheshunoff v. United States*, 2013 U.S. Dist. LEXIS 180879 (W.D. Tex. 2013)..............40

*Southgate Master Fund, LLC ex rel. Montgomery Cap. Advisors, LLC v. United States*, 651 F. Supp. 2d 596, 668 (N.D. Tex. 2009) ...................................................35, 36

*Trans-Serve, Inc. v. United States*, 2003 U.S. Dist. LEXIS 24245 (W.D. La. 2003).......40

*Trinity Indus., Inc. v. United States*, 757 F.3d 400, 413 (5th Cir. 2014) ..................13, 14

*United States v. Felt & Tarrant Mfg. Co.*, 283 U.S. 269, 272, (1931) ............................39

*United States v. Hancock Bank*, 400 F.2d 975, 981 (5th Cir. 1968)................................40

*U.S. Nat. Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993).........25

*Vons Companies v. United States*, 51 Fed. Cl. 1, 6 (2001)........................................13, 37

*Young v. United States*, 609 F. Supp. 512, 516 (N.D. Tex. 1985)....................................40

U.S. CONST. art I, § 7 ...........................................................................................24

Statutes:

1 U.S.C.:

     § 204(a) .................................................................................................24

26 U.S.C.:

     § 155...................................................................................................23

     § 155 (a)(4)(A)........................................................................24, 27, 30

     § 170........................................................................4, 19, 23, 26, 27

§ 170(f)..................................................................................................................19
§ 170(f)(8)..............................................................................................................15
§ 170(f)(8)(B)(i).......................................................................................19, 30, 31
§ 170(f)(8)(b)(i).....................................................................................................41
§ 170(f)(8)(C)....................................................................................................31, 30
§ 170(f)(11)(A)(ii)(II)...........................................................................................32
§ 170(f)(11)(C).......................................................................................................21
§ 170(f)(11)(D) ................................................................................................31, 30
§ 170(f)(11)(E)(ii)............................................................................................30, 31
§ 170(f)(18)...........................................................................................21, 26, 27, 30
§ 4966(d) ..................................................................................................................4
§ 6109 ....................................................................................................................23
§ 6109(d) ...............................................................................................................23
§ 7701(a)(1) ...........................................................................................................21
§ 7701(a)(41) .........................................................................................................23

Fed. R. Civ. P. 56 ....................................................................................................1
Fed. R. Civ. P. 56(a) .............................................................................................14

Treasury Regulations:
26 C.F.R.:

§ 1.170A-13 ...........................................................................................................38
§ 1.170A–13(c)(3)(ii)(E)...........................................................21, 22, 25, 30, 31
§ 1.170A-13(c)(3)(B)........................................................................................21, 31
§ 1.170A-13(c)(5) ............................................................................................21, 31
§ 1.170A-17 ...........................................................................................................22
§ 1.170A-17(a)(3)(iv)(A)..................................................................................22, 23
§ 1.170A-17(c) .......................................................................................................22
§ 301.6402–2(b)(1) .........................................................................................39, 40

Miscellaneous:

Am. Bar Assoc. Section of Real Property....................................................................27

H.R. Conf. Rep. 109-455 (2006), 182, 2006 U.S.C.C.A.N. 234, 372 .......................26, 27

Jarrod Shobe, Codification and the Hidden Work of Congress, 67 UCLA L. REV. 640,
    666 (2020)................................................................................................................24

Pub. L. 98-369, § 155(a)(4)(E), as amended Pub. L. 99-514, §  2 (1986), 100 Stat. 2095
    (codified as a note to 26 U.S.C. § 170).............................................................19, 23

Tax-Exempt Charitable Organizations: Hearing Before the H. Comm. On Ways &
    Means, 110th Cong. 55 (2007)  ..................................................................................27

Treasury's Report to Congress on Supporting Organizations and Donor Advised Funds,
Dec. 2011, at 2 ..................................................................................................................4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KEVIN M. KEEFER & PATRICIA S. KEEFER, | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Case No.: 3:20-cv-00836-B |
| UNITED STATES OF AMERICA, | § § | |
| *Defendant*. | § § | |

## UNITED STATES' BRIEF IN SUPPORT
## OF ITS AMENDED MOTION FOR SUMMARY JUDGMENT

The United States moves for summary judgment in its favor to deny an income tax refund to Plaintiffs Kevin M. Keefer and Patricia S. Keefer pursuant to Rule 56 of the Federal Rules of Civil Procedure. In 2015, Plaintiffs Kevin and Patricia Keefer made a purported $1,257,000 charitable contribution in the form of a 4% partnership interest to the Keefer Donor Advised Fund with the Pi Foundation, Inc. ("Pi"). The Keefers are not entitled to the income tax refund they seek. Below, the United States addresses four issues that either result in no refund or a reduced refund:

A. The Keefers' purported non-cash donation of a limited Partnership interest was a transaction to which the anticipatory assignment of income doctrine applies, and therefore the Keefers are required to recognize all of the income associated with that Partnership interest for tax year 2015, as it existed prior to their purported donation to Pi.

B. The Keefers' charitable contribution of a partnership interest fails to meet the statutory and regulatory substantiation requirements. They submitted an appraisal for different property, the appraisal lacked a required tax identification number for the appraiser, and they failed to obtain the required contemporaneous acknowledgment of exclusive legal control by the donee.

C. The additional tax imposed by the IRS on the gain from a bargain sale should be reversed.

D. Any alternative claim for a deduction based on a cash donation is barred by the doctrine of variance as codified in the Treasury regulations.

I.    UNDISPUTED MATERIAL FACTS

    A.    Kevin Keefer's Ownership in the Partnership

Kevin Keefer worked as a CPA for twenty years and has been managing his own hospitality-related business, including a hotel management administrative company, since 1995. App. 004, Ex. 1, Deposition of Kevin Keefer, 13-14 at 3-8.  Similarly, Patricia Keefer is a CPA and worked for approximately thirty years as a CPA prior to retiring in 2005.  App. 243, Ex. 2, Deposition of Patricia Keefer, 9-12 at 13-18.  The Keefers are therefore sophisticated in accountancy and as business owners.

Kevin Keefer[1] owned an interest in Burbank HHG Hotel, LP, ("Partnership") in an indirect manner, through another entity which he owned.  App. 009, Ex. 1, Keefer Dep., 34 ln 7-13, 35-36 ln 24-4.  The Partnership was formed in 2000, and existed for the purpose of building, owning, and operating, a hotel in Burbank, California ("Hotel").  App. 255-275, Ex. 3, Agreement of Limited Partnership.  The Partnership's agreement was amended, and the Second Amended and Restated Agreement was effective during the tax year at issue, 2015.  App. 276-308, Ex. 4.

    B.    The Partnership Received Verbal and Written Offers to Purchase the Hotel

By early 2015, the Partnership sought to sell the Hotel.  App. 009-010, Ex. 1, Keefer Dep. 36-37 ln 16-6.  Keefer marketed the Hotel by contacting institutional owners that he knew purchase hotels.  *Id*.  The Partnership received several verbal offers, and two written offers, to purchase the Hotel.  App. 010, Ex. 1, Keefer Dep. 37-39 ln 24-10.  In late April of 2015, Apple

---

[1] "Keefer" when used singularly is to describe Kevin Keefer.

Nine Hospitality, Inc.'s ("Apple") parent entity sent the Keefer a written letter of intent to purchase the Hotel and another property. App. 010-011, Ex. 1, Keefer Dep. 39-41 ln 17-5; App. 047-050, Ex. 2 to Keefer Dep. In addition, RLJ Lodging Trust ("RLJ") sent Keefer a second written offer to purchase the Hotel. App. 011, Ex. 1, Keefer Dep. 42-43 ln 8-15; App. 054, Ex. 2 to Keefer Dep.

### C.    Keefer Sought to Reduce his Anticipated Tax Liability on the Hotel sale

Having received the verbal offers, and two written offers, to purchase the Hotel, Keefer knew that he would soon be liable for a large tax liability. To minimize his tax liability, he along with three partners, began investigating whether they could donate a portion of their Partnership interests to a charity. App. 012, Ex. 1, Keefer Dep. 46-48 ln 13-15; App. 055-056, Ex. 3 to Keefer Dep. The President of the Partnership stated in an email:

> **From:** Brent Andrus [mailto:bandrus@dallasmc.com]
> **Sent:** Friday, May 08, 2015 5:42 AM
> **To:** Kevin Keefer
> **Cc:** Jeremy Andrus
> **Subject:** Re: Can we talk in the morning
>
> Kevin,
> IRS regs certainly do make things difficult. It will be painful to pay huge taxes and then only donate after-tax money. Thanks for checking. Hopefully Ken will come up with something a bit more encouraging.
>
> Sent from my iPad

App. 013, Ex. 1, Keefer Dep. 49-51 ln 24-2; App. 063, Ex. 4 to Keefer Dep. On May 16, 2015, Keefer conveyed in an email to his partners, key items to consider with respect to donating a Partnership interest to a charity. App. 013, Ex. 1, Keefer Dep. 51 ln 20-24; App. 061-063, Ex. 4 to Keefer Dep. One of the key items, according to Keefer, was that an appraisal had to meet the IRS specific requirements. *Id.* These key items were drafted and provided to Keefer by one of his attorneys. App. 013, Ex. 1, Keefer Dep. 51-52 ln 25-11.

**D.      Keefer and Pi Plan the Donation, Including Planning for the Sale of the Hotel**

By May 20, 2015, Keefer had identified Pi Foundation, Inc. ("Pi") as a donee for some

portion of his interest in the Partnership.  Pi is a § 501(c)(3) donor advised fund.  Donor advised

funds ("DAFs") are defined by the Internal Revenue Code.  26 U.S.C. § 4966(d).  While they

have been in existence for some time, the Pension Protection Act of 2006 made changes to

charitable giving with respect to DAFs, increasing the requirements on donors due to concerns

regarding donor influence or control over the DAFs.  *See* Department of the Treasury's Report to

Congress on Supporting Organizations and Donor Advised Funds, Dec. 2011, at 2.[2]

Keefer described the steps of his plan, which included his assigning the interest to be

donated to Pi, amending the Partnership's agreement to admit Pi, and selling the donated asset, in

an email. App. 013, Ex. 1, Keefer Dep. 51 ln 20-24, Ex. 6 to Keefer Dep.  The email was

addressed to Scott McCollough ("McCollough"), a representative of Pi, Kenneth M. Horwitz

("Horwitz"), Keefer's tax attorney, Brant Weigand ("Weigand"), Keefer's CPA.  *Id.*; App. 358-

359, Ex. 5, Deposition of Kenneth M. Horwitz, 197-200 ln 21-6.

On the same date, McCollough, provided to Keefer, Horwitz, and Weigand, a draft copy

of the donor packet forms that Pi typically uses for its donors.  App. 349-351, Ex. 5, Horwitz

Dep. 159-166, ln 11-4.  Despite having had the opportunity to do so, Horwitz has no recollection

of having reviewed the donor packet, providing written or oral advice to Keefer regarding the

packet, reviewing the documents to make sure that they complied with Section 170 of the

Internal Revenue Code or its regulations, nor communicating any concerns about the packet to

anyone.  *Id.*  Similarly, Keefer has no recollection of receiving information from Weigand, or

Horwitz, about whether Pi's donor packet met the requirements for a charitable contribution

deduction. App. 023-024, Ex. 1, Keefer Dep. 91-93 ln 20-23.

In connection with planning for the donation to Pi, Keefer also asked Weigand to prepare tax projections in May 2015. App. 016-017, Ex. 1, Keefer Dep. 64-68 ln 16-20, App. 067-082, Ex. 8 to Keefer Dep. The tax projections anticipated that Keefer would donate various percentages or amounts of his interest in the Partnership, and that the Hotel would be sold for $54,000,000. *Id.* Finally, neither Weigand nor Horwitz provided tax opinion letters to the Keefers regarding their proposed transaction. App. 533, Ex. 8, Deposition of Brant Weigand 171 at 10-15; App. 319, Ex. 5, Horwitz Dep. 41-43 ln 17-11. The Keefers submitted no opinion letters, and no correspondence detailing advice or suggestions that Weigand or Horwitz provided. App. 553, Ex. 9, Plaintiffs' Response to Defendant's First Request for Production at Response 17.

### E.    Keefer Assigns a 4% Interest through his various entities to himself

To execute his plan, on May 29, 2015, Keefer assigned a 4% limited interest in the Partnership in three successive assignments from entities that he owned, resulting in his direct ownership of a 4% limited interest in the Partnership. App. 392-393, Ex. 6, Deposition of

---

[2] *See* Report at https://www.treasury.gov/resource-center/tax-policy/Documents/Report-Donor-Advised-Funds-2011.pdf

Plaintiff's Expert David Marshall, 91-94 ln 19-22, App.445-450, Ex. 13 to Marshall Dep.



### F.    Keefer Purportedly Donates a 4% Partnership Interest to Pi

After these assignments, Keefer continued to hold 21% of the Partnership indirectly

through Burbank HHG Associates, LLP, and held 4% of the Partnership directly.  On June 18,

2015, Keefer purportedly assigned to Pi a 4% interest in the Partnership.  App. 392-393, Ex. 6,

Marshall Dep., 91-94 ln 19-22, App. 443-444, Ex. 13 to Marshall Dep.  When asked why the 4

% interest could not have been transferred by Burbank HHG Associates, LP to Keefer directly,

Keefer stated that this was the procedure that Horwitz (his tax attorney) wanted to use.  App.

022, Ex. 1, Keefer Dep. 85 ln 11-16.  These sequential transfers were consented to by the

Partnership.  App. 020, Ex. 1, Keefer Dep. 78-79 ln 21-25, App. 083, Ex. 10 to Keefer Dep. On

June 5, 2015, Pi issued Keefer a purported contemporaneous written acknowledgment ("CWA").

This CWA (1) identified the donated property as "4% of interest in [the Partnership]"; and (2) memorialized that Keefer transferred an "irrevocable charitable donation" to Pi.

Pi's entire donor packet was also attached to the CWA.  App. 037, Ex. 1, Keefer Dep. 147 ln 5 -22, App. 084–097, Ex. 11 to Keefer Dep.  Keefer does not recall whether he provided the CWA in June 2015, to Horwitz or Weigand.  App. 037, Ex. 1, Keefer Dep. 147-148 ln 23-18, Pi also provided a letter to Keefer in September of 2015 confirming Keefer's purported contribution.  App. 036-037, Ex. 1, Keefer Dep. 143-146 ln 25-23, App. 098, Ex. 12 to Keefer Dep. Horwitz confirms that these two documents are the only CWAs provided to Keefer.  App. 342, Ex. 5, Horwitz Dep. 135-136, ln 23-5.  Neither document has the required statutory language stating that Pi would have "exclusive legal control" of the donated property.

Several years after the Keefer's 2015 tax return filed with the IRS, Horwitz sent an email to Pi representatives, on June 26, 2019, stating "Missing a required statement under Section 170(f)(18) of the IRC."  App. 355, Ex. 5, Horwitz Dep. 182-183, ln 11-14, App. 365, Ex. 11 to Horwitz Dep.  While Horwitz believed at that time the statutory exclusive control language was missing and required, he later testified (in his deposition after this suit was filed) that is no longer his opinion.  *Id*.  Similarly, Horwitz' October 23, 2020 email to Pi representatives states that under Section 170(f)(18) requires a Foundation acknowledgment that the foundation has "exclusive legal control over the assets contributed."  App. 355-356, Ex. 5, Horwitz Dep. 184-188, ln 6-10, App. 367-368, Ex. 12 to Horwitz Dep.  Horwitz later testified however that his email was not precisely worded.  Then in mid-August 2015, the Partnership sold the Hotel to Apple.  App. 486, Ex. 7, Deposition of Scott McCollough Dep. 141, 17-23.  In September 2015, the Partnership then allegedly wired funds of $1,280,000 from the proceeds of the sale of the Hotel to Pi.  These funds were used to fund the sub-donor advised fund created by Pi on behalf

7

of the Keefers, the Keefer Donor Advised Fund. Three thousand dollars of the funds wired were allegedly retained by Pi directly to pay its fees in connection with the Keefer Donor Advised Fund.

### G.    Appraisal Attached to the Keefers' 2015 Tax Return

In early December 2015, Horwitz, hired David Marshall ("Marshall") of Katzen, Marshall & Associates, Inc. to appraise the purported donation of a 4% limited Partnership interest to Pi. App. 028, Ex. 1, Keefer Dep. 110-111 ln 22-21, App. 205-240, Ex. 15 to Keefer Dep. Marshall appraised, however, not a 4% interest of the Partnership, but a 4% limited interest of the Partnership "***subject to an oral agreement***," with a valuation date of June 18, 2015. App. 205, *id*. Marshall concluded that $1,257,000 reasonably represented the fair market value of a 4 percent limited interest in the Partnership, "excluding other assets of the Partnership." App. 400-401, Ex. 6, Marshall Dep., 124-125 ln 25-4; App. 413, Ex. 1 to Marshall Dep. He did not define the other assets, however, in the appraisal ("Appraisal") and admitted that not doing so was an oversight. App. 401, Ex. 6, Marshall Dep., 125 ln 5-15. Marshall stated that including the other assets in the Appraisal would change his opinion about the appraised value stated in his report. *Id.*

Despite his admissions about his failure to define and explain the impact of the other excluded assets, Marshall valued a 4% limited interest of the Partnership excluding other assets of the Partnership - at $1,257,000. App. 401, 407, *id*. In conducting his appraisal, Marshall determined the value of the donated property by relying, inter alia, "the oral agreement." App. 381, Ex. 6, Marshall Dep., 47 ln 8-12. Additionally, based on Marshall's judgment, as of June 18, 2015, his Appraisal states that there was only a five percent chance or probability that the Hotel would not sell. App. 389, Ex. 6, Marshall Dep., 80 ln 6-18, App. 412, Ex. 1 to Marshall

Dep.  Marshall also confirmed that before he completed his Appraisal, he had not reviewed the requirements in 26 CFR 1.170A-13, and the Appraisal he prepared did not include the tax identification number for Katzen Marshall & Associates.  App. 378-379, Ex. 6, Marshall Dep., 35-39 ln 24-39.

> ### H.     Keefer's Oral Agreement that was a part of his Donation Scheme

Marshall learned that there was an oral agreement from Keefer.  App. 393-394, Ex. 6, Marshall Dep., 96-98 ln 8-7.  He did not know, however, when it was entered into.  *Id.*  The only terms of the oral agreement that Marshall was provided were stated in his Appraisal, "By oral agreement, the Foundation and Donor agreed that the Foundation would only share in the proceeds from the Seller's Closing Statement; the Foundation would not receive its pro rata share in the other net assets of the Partnership."  *Id.*, App. 411, Ex. 1 to Marshall Dep.

In contrast, McCollough, the Pi representative, had no knowledge of an oral agreement that Pi made with Keefer, and confirmed with the trustees of Pi prior to testifying that Pi does not make oral agreements.  App. 464, Ex. 7, McCollough Dep., 53-54 ln 10-18.  Like McCollough's testimony, Weigand had no knowledge of the oral agreement when he was preparing the Keefers' 2015 tax return and confirmed that Keefer only provided information about an oral agreement to him in 2021 – while this suit was pending.  App. 511-512, Ex. 8, Weigand Dep., 85-89 ln 9-18.  Weigand stated that while he was engaged to prepare the IRS Form 8283 reporting the Keefers' non-cash charitable donation to Pi for tax year 2015 as part of their return, Horwitz was tasked with obtaining the appraisal and that he was not engaged to review the Appraisal.  App. 512, Ex. 8, Weigand Dep., 89-90 ln 21-17.  Therefore, neither Pi nor Keefer's CPA knew of an oral agreement in 2015 regarding Keefer's purported donation to Pi.

9

Keefer's tax attorney, Horwitz, further testified that the oral agreement referenced in Marshall's Appraisal was a purported agreement because he did not have knowledge of it.  App. 351-352, Ex. 5, Horwitz Dep. 168-172 ln 13-3.  When asked why Keefer did not provide him information regarding an oral agreement in 2015, Horwitz stated that Keefer communicated with Marshall directly and he was not privy to all their communications.  Nonetheless, it is clear that Keefer did not inform Weigand, Horwitz, or Pi, in 2015, of an oral agreement that he claims existed.  Keefer confirmed that he did not provide information regarding the oral agreement to his tax advisors, Weigand and Horwitz.  App. 030-031, Ex. 1, Keefer Dep. 119-124 ln 12-7.

Only Keefer was able to testify during discovery in this case as to the substance of the oral agreement.  According to Keefer, the general partner of the Partnership decided that the Partnership's cash reserve accounts would be distributed to the partners of the Partnership before Pi was admitted as a partner because these reserves were earnings that had not been distributed out prior to the donation.  App. 030-031, Ex. 1, Keefer Dep. 119-124 ln 12-7.  The Partnership determined that Pi would not share in the cash reserves of the Partnership and would only receive proceeds from the sale of the Hotel.  *Id*.  In other words, PI was not getting a full 4% interest in the Partnership.

### I.    The Keefers' 2015 Tax Return and the IRS' corresponding audit

In October 2016, the Keefers submitted their 2015 tax return, attaching IRS Form 8283 that reflected a charitable contribution deduction of a 4% limited Partnership interest donation to Pi, and the Appraisal prepared by Marshall.  App. 024, Ex. 1, Keefer Dep. 96 ln 7-13; App. 099– 204, Ex. 13 to Keefer Dep.; App. 509, Ex. 8, Weigand Dep., 77 ln 11-18, Ex. 10 to Weigand Dep.; App. 205–240, Ex. 15 to Keefer Dep.  On their tax return itself, the Keefers report the flow

through income from the sale of the Hotel, but only report 21% of that gain, having purportedly donated a 4% interest in the Partnership to Pi before the date of sale.

The IRS Form 8283, Noncash Charitable Contributions, submitted by the Keefers' only includes the taxpayer identification number of Katzen, Marshall & Associates, Inc. and not of the tax identification number of the individual appraiser, David Marshall.  App. 541–542, Ex. 10 to Weigand Dep.  The Keefers' Form 8283, and its attachment, describe the property donated as a "4% LIMITED PARTNERSHIP INTEREST IN A RESL ESTATE PARTNERSHIP-BURBANK HHG HOTEL LP."  App. 542, Ex. 10 to Weigand Dep.  The Appraisal does not include Marshall's tax identification or social security number.  App. 205–240, Ex. 15 to Keefer Dep.  Additionally, as discussed above, the Appraisal asserts that it is appraising a 4% limited partnership interest in the Partnership "subject to an oral agreement."  App. 205, Ex. 15 to Keefer Dep.  The IRS later rejected the Keefers' purported $1,257,000 charitable contribution deduction during an audit of the Keefers' 2015 tax return.  As a result, on or around October 28, 2019, the Keefers paid income tax and related penalties totaling $507,964.80.  The Keefers then filed, on or around November 7, 2019, an amended income tax return for tax year 2015 seeking a refund of $507,964.80, attaching an explanation to their amended return stating the bases upon which their amended return was based and the reason that they were entitled to a refund.  App. 556-663, 560.  Ex. 10, Keefers Form 1040X for 2015.  On March 19, 2020, the IRS denied the Keefer's timely claim for refund.  On April 10, 2020, the Keefers filed this timely refund suit.

### J.    Three Scenarios Computed by IRS Revenue Agent Amy Dunford

At the request of counsel for the United States, IRS Revenue Agent Amy Dunford ("Agent Dunford") completed computations for three potential outcomes that might arise if the Court decides issues raised by the parties in a way that do not result in the full refund sought by

11

the Keefers.  On October 7, 2021, the United States produced Agent Dunford's three computations.  App. 634-636, Ex. 11, Affidavit of IRS Revenue Agent Amy Dunford; App. 637-689, Ex. 11, Agent Dunford's Computations.

All three of Agent Dunford's computations reflect a different combination of four issues and whether the United States or the Plaintiffs prevail on those issues: (A) the United States' previously raised anticipatory assignment of income argument [Dkts. 27, 28-4]; (B) the Keefers' previously raised argument for a charitable contribution deduction based on a 4% partnership interest [Dkt. 15 at 10]; (C) the Keefers' previously raised argument for revision to gain on the bargain sale adjustment interest [Dkt. 15 at 10]; and (D) the United States' previously asserted doctrine of variance defense which bars relief on any ground not asserted in the Keefers' administrative claim for refund including any charitable deduction for cash donation rather than a partnership interest donation [Dkt. 19 at 1]. Agent Dunford's computations for Scenario 1 apply if the United States wins Issues (B) and (D), but the Keefers wins Issues (A) and (C).  The computations in Scenario 2 apply if the United States wins Issues (A), (B) and (D), but the Keefers win issue (C).  The computations in Scenario 3 apply if the United States wins Issues (A) and (B), but the Keefers win issues (C) and (D).

## II.    LEGAL STANDARD

This is a tax refund suit.  Tax refund suits are *de novo* proceedings.  Thus, the Government is free to challenge the request for refund on any grounds.  *See Trinity Indus., Inc. v. United States*, 757 F.3d 400, 413 (5th Cir. 2014) ("In tax refund actions, the district court reviews *de novo* the Commissioner's decision regarding a taxpayer's tax liability."  As a result, "[t]he Government may assert at the trial of a refund suit a theory not previously presented in the course of the proceedings."  *Kincaid v. United States*, 682 F.2d 1220, 1222–23 n.3 (5th Cir. 1982) (citations omitted).  Similarly, in a refund suit, the Government can assert other

adjustments to the taxpayer's return such as additional unreported income or disallowance of other deductions that have the effect of eliminating any overpayment of tax claimed as a result of the theories asserted by the taxpayer seeking a refund. *Lewis v. Reynolds*, 284 U.S. 281 (1932); *see also Davis v. United States*, No. CA 4-2430, 1977 WL 1172, at *3 (N.D. Tex. Apr. 12, 1977). The application of this standard of review to this case is discussed further below.

It is "axiomatic" that tax refund suits are "de novo proceedings." *See Trinity Industries, Inc. v. United States*, 757 F.3d 400, 413 (5th Cir. 2014). Citing a leading treatise, the Fifth Circuit further noted that "any record made in the Service, including the reasons for the [the tax] assessment, is irrelevant...." *Id.* at n. 33. *See also King v. United States*, 641 F.2d 253, 259 (5th Cir. 1981) (IRS "theory" immaterial in subsequent refund suit); *Vons Companies v. United States*, 51 Fed. Cl. 1, 6 (2001) (citing *Lewis v. Reynolds*, 284 U.S. 281, 283 (1932)).

But what does that mean? It means that, not only are any internal analyses, thoughts and actions of the IRS during a prior audit or examination of a refund claim not binding on the United States in a refund case, but also that they are irrelevant, and of no consequence, in a refund case, as a matter of law. *See, e.g., R.E. Deitz Corp. v. United States*, 939 F.2d 1, 4 (2d Cir. 1991) (noting that, the "factual and legal analysis employed by the Commissioner is of no consequence to the district court."); *Vons, supra*, (explaining that "no weight [is] given to subsidiary factual findings made by the Service in its internal administrative proceedings"); *National Right to Work Legal Defense and Ed. Foundation v. United States*, 487 F. Supp. 801, 805 (E.D. N.C. 1979) (observing that the "court's determination is de novo. The Court does not review the action of the Commissioner, for there is in fact no record to review."); *Detroit Screwmatic Co. v. United States*, 49 F.R.D. 77, (S.D.N.Y. 1970) (internal IRS files "form no part of the plaintiff's case."). The Fifth Circuit has long adhered to this bedrock principle. *See King*

13

*v. United States*, 641 F.2d 253, 259 (5th Cir. 1981) (finding that whether the IRS relied upon an improper theory on audit is "immaterial").

Because the actions and reasoning of the IRS are irrelevant in this tax refund suit, Plaintiffs are not entitled to summary judgment holding the IRS erred as a matter of law in denying the Plaintiffs' deduction and administrative refund request, nor are they entitled to a refund of the tax that they seek based on the findings of the IRS' prior audit.  Instead, the Plaintiffs' bear the burden of proof in a refund suit to prove the amount they are entitled to recover.  *Bombardier Aerospace Corp. v. United States*, 94 F. Supp. 3d 816, 840 (N.D. Tex. 2015), aff'd, 831 F.3d 268 (5th Cir. 2016).  Furthermore, the government's deficiency assessment is generally afforded a presumption of correctness.  *Id*. at 840.  The Plaintiffs have the burden of proving by a preponderance of the evidence that the Commissioner's assessment—its final determination of the taxpayer's liability—was erroneous, since the assessment is presumed to be correct.  *Id*. at 840, *citing Trinity Indus., Inc. v. United States*, 757 F.3d 400, 413 (5th Cir.2014).  Therefore, the Plaintiffs' must prove they are entitled to the tax refund they seek, proving by a preponderance of the evidence that the assessment was erroneous, no matter what grounds the IRS' prior audit or analyses determined were the reasons for the assessment.

Additionally, the Court should grant summary judgment if the movant shows that no genuine dispute exists as to any material fact and that "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Austin v. Kroger Tex., L.P*., 864 F.3d 326, 328 (5th Cir. 2017) (citation omitted).

The Court should "draw all reasonable inferences in favor of the nonmoving party and avoid credibility determinations and weighing of the evidence."  *Powers v. Northside Indep. Sch.*

*Dist.*, 951 F.3d 298, 307 (5th Cir. 2020) (citation omitted).  The non-moving party "must go beyond the pleadings and identify specific evidence in the record showing" that "a genuine issue for trial" exists.  *Id*.

## III.    ARGUMENT

The Keefers are not entitled to the full refund they seek for four reasons.  First, the Keefers' charitable contribution constitutes an anticipatory assignment of income (Issue A). This means that 4% of the overall gain on the sale of the Hotel by the Partnership should be recognized as income to the Keefers' in 2015 and there would be no charitable deduction for donation of a partnership interest.  Under Agent Dunford's computations for Scenario 2, the Keefers would actually owe money to the United States, but the time to assess them with additional tax liability has expired.  Nonetheless, they are not entitled to any refund if the assignment of income doctrine is applied.  Second, if the Court determines that the assignment of income doctrine does not apply, it should still deny a portion of the refund sought because, the Keefers' failed to comply with the strict statutory requirements for deductions of non-cash property to donor advised funds.  (Issue B).  Their Appraisal does not value the property they claim to have donated and lacks the appraiser's tax identification or social security number. Additionally, their purported contemporaneous written acknowledgment (CWA) fails to include the statutory exclusive legal control language.  If the Court agrees with the United States on the statutory substantiation requirements Issue B, then under Agent Dunford's computations for Scenario 1, the Keefer's will not be entitled to a charitable deduction, but they are still entitled to a smaller refund than they requested ($136,875) because the related additional tax for gain on a bargain sale would have to be reversed. (Issue C).   Finally, the Keefers are not entitled any refund based on an alternative argument just asserted in their most recent Amended Complaint for a charitable donation of cash rather than a partnership interest.  They failed to include this

15

ground for relief in their administrative claim for refund (amended return) and it is now barred

by the doctrine of variance as codified in the Treasury regulations. The Court lacks jurisdiction

to grant a refund arising from a donation of cash. (Issue D). Although Agent Dunford computed

a theoretical amount of refund that an alternative claim for a cash donation would have generated

in her Scenario 3, that calculation is by no means an admission that the Keefer's are entitled to

such relief.

**Issue A.    The Keefers' charitable contribution is an anticipatory assignment of income**

"The assignment of income doctrine holds that one who earns income cannot escape tax

upon the income by assigning it to another." *Salty Brine I, Ltd. v. United States*, 761 F.3d 484,

491 (5th Cir. 2014) (citation omitted). Two inquiries are critical to determine whether the

assignment of income doctrine applies. First, "whether the receipt of income was practically

certain to occur" considering "the realities and substance of events." *See Ferguson v. Comm'r*,

174 F.3d 997, 1003 (9th Cir. 1999). Second, "whether the asset itself, or merely the income

from it, has been transferred." *Salty Brine I, Ltd.*, 761 F.3d at 491 (citation omitted). "If the

taxpayer carves income or a partial interest out of the asset, and retains something for himself,

the doctrine applies." *Id*. (citation omitted).

Here, both inquiries are answered in the affirmative: the anticipatory of assignment of

income doctrine applies. First, the sale to the Hotel was "practically certain to occur." *See

Ferguson*, 174 F.3d at 1003. Indeed, the Appraisal itself pronounced a 95% chance of a sale

would take place on the date Keefer donated his assignment. App. 389, Ex. 6, Marshall Dep., 80

ln 6-18, App. 412, Ex. 1 to Marshall Dep. ("The probability of the downside case appears to be

very low . . . 5% probability of no sale . . . ."). Additionally, the Keefers had received several

verbal offers as well as two written offers to purchase the Hotel. Furthermore, Keefer outlined

his plan to his tax advisors, and requested that Weigand prepare tax projections for him in May

2015 – well before the August 2015 sale of the hotel.

The Ninth Circuit addressed a similar case involving a donation to a charity during a

transaction. *See Ferguson*, 174 F.3d at 1003.  In *Ferguson*, the taxpayers transferred stock to

charities after an agreement of a merger, but before that merger was technically effectuated.

*Ferguson*, 174 F.3d at 1006.  In determining when the taxpayers' right to the income ripened, the

*Ferguson* court focused on the time when "the surrounding circumstances were sufficient to

indicate that the tender offer and the merger were practically certain to proceed by the time of

their actual deadlines," rather than "mere formalities and remote hypothetical possibilities."  *Id*.

at 1004. The *Ferguson* court found that before the taxpayers transferred their stock, it had

become "quite unlikely" the merger would fail—much like the Hotel sale to Apple—noting the

tender offer had gained significant momentum and all parties sought to benefit from the merger.

*See id.* at 1005.

Similarly, the Hotel sale to Apple had become "quite unlikely" to fail as the Appraisal

noted only a "5% probability of no sale."  *See id*.; *see also* App. 210, Ex. 15 to Keefer Dep.

Second, the Keefers carved out their share of the previously existing Partnership cash

reserves from their donation to Pi.  They did not donate a true 4% interest in a partnership.

"[The Keefers] cannot slice up the scheme into a series of small parts; the thrust of the applicable

law set out above is to look at the big picture."  *See Salty Brine I, Ltd.*, 761 F.3d at 493.  The "big

picture" is that the Keefers cannot deny another limited partner, like Pi, ownership to some of the

Partnership's assets.  *See Biggs v. First Nat. Bank of Lubbock*, 808 S.W.2d 232, 237 (Tex.

App.—El Paso 1991, writ denied) ("regardless of which partner had legal title, no partner owns

specific partnership property but each owns a specific interest").  And the Partnership owned all

of its assets—including the cash reserves.  Since the Keefers carved a "partial interest out of the [Partnership] asset and retain[ed] something for [themselves]," the anticipatory assignment of income doctrine applies.  *See Salty Brine I, Ltd.*, 761 F.3d at 491.  On their 2015 tax return, the Keefers reported the flow-through income from the sale of the Hotel, but only reported 21% of that income, having purportedly donated a 4% interest in the Partnership to Pi before the date of sale.  App. 205, Ex. 15 to Keefer Dep.  In doing so, the Keefers attempted to divert 4% of the gain on the sale of the Hotel.  However, because the anticipatory assignment of income doctrine applies, the Keefers are required to pay tax on 25% of the flow-through income resulting from the sale of the Hotel.  Because the gain on the sale of the Partnership's assets is necessarily removed from Pi and returned to the taxable income of the Keefer's under the anticipatory assignment of income rule, there is no longer a donated partnership interest and Issue B becomes moot.

**Issue B.   The Keefers' purported donation of a partnership interest fails the statutory substantiation requirements.**

Even if the Court were to find that the anticipatory assignment of income doctrine does not apply, the Keefers' Appraisal was flawed and fails to meet the strict statutory requirements for such charitable deductions for two reasons.  First, the Appraisal appraised property different than the what the Keefers documented.  Second, the Appraisal lacked the appraiser's tax identification or social security number.  Third, the purported charitable contribution is not supported by the required contemporaneous written acknowledgment of exclusive legal control.  Although the Keefers seek to overcome these hurdles with two defenses—substantial compliance and reasonable cause—neither apply.

1.    *The IRS properly denied the Keefers' charitable contribution deduction because their Appraisal valued different property than described in previous assignments and Form 8283*

To qualify for a charitable contribution deduction, the taxpayers must accurately describe the donated property.  *See* 26 U.S.C. § 170(f).  Congress required this description in two places: the CWA and the appraisal.  The CWA must include "a description (but not value) of any property other than cash contributed."  § 170(f)(8)(B)(i).  And the Appraisal must also include "a description of the property appraised."  Pub. L. 98-369, § 155(a)(4)(A), as amended Pub. L. 99-514, § 2 (1986), 100 Stat. 2095 (codified as a note to 26 U.S.C. § 170). "The description requirement is important, indeed essential, to the review of charitable contribution deductions and the reliability of corresponding appraisals."  *Campbell v. Comm'r*, 119 T.C.M. (CCH) 1266 (T.C. 2020) (citation and alterations omitted).  "Absent a description of the contributed property, the appraisal and its valuation of the donated property are meaningless."  *Id*.

Here, in each successive assignment—from Burbank HHG Associates, LP to Keefer and then ultimately to Pi—all reflect a 4% interest in the ***entire*** Partnership.  *See* App. 443–450, Ex. 13 to Marshall Dep.  And Pi too characterizes Keefer's donation as one consisting of 4% of the entire Partnership.  *See* App. 084, Ex. 11 to Keefer Dep.; App. 098, Ex. 12 to Keefer Dep. Above all, the description in IRS Form 8283, Noncash Charitable Contributions, which the Keefers attached to their 2015 income tax return, describes the donated property as 4% of the limited partnership interest in the Partnership.  App. 542, Ex. 10 to Weigand Dep.

| Document | Citation | Description of Donation to Pi |
|---|---|---|
| Appraisal | App. 211, 413 | 4% Limited Partnership Interest in the Partnership "***excluding Other Assets of the Partnership***." |
| CWA | App. 084, 098 | 4% Limited Partnership Interest in the Partnership |
| Assignment | App. 443–450 | 4% Limited Partnership Interest in the Partnership |

| Document | Citation | Description of Donation to Pi |
|----------|----------|------------------------------|
| Form 8283 | App. 542 | 4% Limited Partnership Interest in the Partnership |

However, the Keefers submitted an appraisal of something different than the property described in the CWA and Form 8283. *Compare* App. 205, 209 with App. 542. In other words, the Keefers "had the wrong asset appraised." *See Est. of Evenchik v. Comm'r*, 105 T.C.M. (CCH) 1231 (T.C. 2013) (finding that a charitable deduction was properly denied when a taxpayer, among other things, appraised a property different from the one donated). Rather than value a 4% interest in the ***entire*** Partnership, they valued the 4% limited partnership interest in the Partnership "excluding Other Assets of the Partnership." App. 400-401, Ex. 6, Marshall Dep., 124-125 ln 25-4; App. 413, Ex. 1 to Marshall Dep. "That miscue goes to the essence of the information required, because without knowing the specific property contributed the Commissioner is unable to determine whether the contributed property interest was overvalued." *See Est. of Evenchik*, 105 T.C.M. (CCH) 1231 (T.C. 2013).

But Marshall opted to appraise—at Keefer's direction—a different property altogether: a 4% Limited Interest in the Partnership "excluding Other Assets of the Partnership." *See* App. 209, Ex. 15 to Keefer Dep.; App. 413, Ex. 1 to Marshall Dep. The Appraisal does not define the excluded assets of the Partnership or their impact on the appraised value, and Marshall admits that had he included the other assets of the Partnership, his appraisal conclusion would have been different. App. 401, Ex. 6, Marshall Dep., 125 ln 5-15. The reason the Keefers structured the deal this way was to masquerade a net cash donation as an assignment of partnership interest and thereby attempt to avoid paying tax on a part of the gain on the sale of the Hotel. Thus, the IRS properly denied the Keefers' charitable deduction.

2.     *The IRS properly denied the Keefers' charitable contribution because the appraiser failed to include his tax identification number*

   i.     **The Keefers' alleged qualified appraisal does not meet the statutory requirement to include the appraiser's identification number**

To qualify for a charitable contribution exceeding $5,000, the taxpayer must submit a "qualified appraisal" of the donated property.  *See* 26 U.S.C. § 170(f)(11)(C).  One of the elements required for a "qualified appraisal" is that it must be "prepared, signed, and dated by a qualified appraiser."  26 U.S.C. § 170(f)(11)(E)(ii) (referring to an individual).  *See also,* 26 U.S.C. § 170(f)(11)(E)(i)(I) (referring to requirements in the regulations); 26 C.F.R. § 1.170A-13(c)(3)(B) (referring to definition of qualified appraiser in (c)(5)); and 26 C.F.R. § 1.170A-13(c)(5) ("The term qualified appraiser means an individual …").  An individual is not and entity or firm.  *See* 26 U.S.C. § 7701(a)(1) defining "person" to include "an individual, a trust, estate, partnership, association, company or corporation."  Thus, neither the Internal Revenue Code or the regulations expressly authorized by it contemplate that the qualified appraiser can be an entity or firm.  However, as explained below, when the individual appraiser is employed by an entity or firm, then additional information for the employer is required.

Federal law further defines "qualified appraisal" as one that includes, among other things, the appraiser's tax identification number or security number: 26 U.S.C. § 170(f)(11)(E)(i)(I) (referring to requirements in the regulations) and 26 C.F.R. § 1.170A–13(c)(3)(ii)(E) (requiring the appraiser's tax identification number).  Treas. Reg. § 1.170A–13(c)(3)(ii)(E), which was applicable for tax year 2015, requires an appraiser to state his identifying number, and states as follows:

> The name, address, and … the identifying number of the qualified appraiser; **and**, if the qualified appraiser is acting in his or her capacity as a partner in a partnership, an employee of any person (whether an individual, corporation, or partnerships), or an independent contractor engaged by a person other than the donor, the name, address, and taxpayer identification number (if a number is otherwise required by

section 6109 and the regulations thereunder) of the partnership or the person who employs or engages the qualified appraiser;

*Id.*, emphasis added.

Therefore the Keefers' appraiser, David Marshall ("Marshall") , pursuant to Treas. Reg. § 1.170A-13(c)(3)(ii)(E), was required in his appraisal to state his (1) name, (2) his address, (3) his identifying number; and (4) and if he was acting in his capacity as a partner in a partnership or as an employee of any person, whether an individual, corporation, or partnership, the name, address, and taxpayer identification number of the partnership or person who employs or engaged him.  Marshall included only his name and his firm's address in the appraisal.  Marshall did not include his individual tax identifying number, nor the identifying number of his employing firm in his appraisal.  And only the employer identification number for the firm was included on the Form 8323.

Congress enacted the Pension Protection Act of 2006, and the Treasury Regulation previously cited by Plaintiffs -- Treas. Reg. § 1.170A-17 -- [Dkt. 26-1 at 7], Treas. Reg. § 1.170A-17, was finalized and effective July 30, 2018.  Treas. Reg. § 1.170A-17(c) does allow taxpayers to rely on the rules of Treas. Reg. § 1.170A-17 for appraisals prepared for returns filed after August 17, 2006.  Under Treas. Reg. § 1.170A-17(a)(3)(iv)(A), Marshall would have had an additional requirement – to state his qualifications – than as previously stated in Treas. Reg. § 1.170A-13(c)(3)(ii)(E).  Treas. Reg. § 1.170A-17(a)(3)(iv)(A) states as follows:

(iv) The following information about the appraiser:

(A) Name, address, and taxpayer identification number.

(B) Qualifications to value the type of property being valued, including the appraiser's education and experience.

(C) If the appraiser is acting in his or her capacity as a partner in a partnership, an employee of any person, whether an individual, corporation, or partnership, or an

independent contractor engaged by a person other than the donor, the name, address, and taxpayer identification number of the partnership or the person who employs or engages the qualified appraiser;

Marshall, pursuant to Treas. Reg. § 1.170A-17(a)(3)(iv)(A), was required in his appraisal to state his individual (1) name, (2) his address, (3) his individual taxpayer identification number; (4) his qualifications; (5) and also if he was acting in his capacity as a partner in a partnership or as an employee of any person, whether an individual, corporation, or partnership, the name, address, and taxpayer identification number of the partnership or person who employs or engaged him. The later heightened requirement regarding Marshall's qualifications is not in dispute. Nonetheless, the Plaintiffs' document attached to their Form 8283 that they allege is a qualified appraisal did not meet the requirements of the Treasury Regulation because it lacked Marshall's individual identifying number as well as the identifying number of his firm. Plaintiffs cannot cure these legal and factual defects by relying on the IRS' audit analyses or the Form 8283 requirements.

### ii.  *The tax identification number requirement is a statutory requirement, and not a regulatory one.*

This requirement in the Treasury Regulation of a taxpayer identification number for the appraiser is directly supported by Pub. L. 98-369, § 155(a)(4)(E), as amended Pub. L. 99-514, § 2 (1986), 100 Stat. 2095 (codified as a note to 26 U.S.C. § 170).[3] "Section 155, in its final form, adopted an approach which did not amend section 170 but provided separate rules for such

---

[3] The Internal Revenue Code defines "TIN" to mean "the identifying number assigned to a person under section 6109." 26 U.S.C. § 7701(a)(41). And § 6109 "provides that the Social Security account number issued to an individual is the identifying number of the individual." *See Kinzer v. United States*, No. CIV.A. H-02-721, 2002 WL 31959138, at *7 (S.D. Tex. Dec. 10, 2002) (citing 26 U.S.C. § 6109(d)).

substantiation." *Hewitt v. Comm'r*, 109 T.C. 258, 261 (1997), *aff'd*, 166 F.3d 332 (4th Cir. 1998).

The Keefers, attempt to misattribute the tax identification number requirement as a regulatory one rather than a statutory one. *See* Compl. ¶ 27, June 30, 2020, ECF No. 15. But the first step in applying the *Chevron* doctrine, the district court must determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Acosta v. Hensel Phelps Constr. Co*., 909 F.3d 723, 730 (5th Cir. 2018) (citation omitted).

Because the requirement for the individual appraiser to submit his tax identification number is a statutory requirement in a statutory note, "Congress has directly spoken to the precise question at issue." *See id.*; *see also* § 155(a)(4)(E), 100 Stat. 2095.

To understand a statutory note's importance, context on how these notes become law is instructive. Once Congress passes a bill, and typically with the President's signature, the bill becomes federal law. U.S. CONST. art I, § 7. These laws are then "published in chronological order in the Statutes at Large, which serve as 'legal evidence' of the law." *Gonzalez v. Vill. of W. Milwaukee*, 671 F.3d 649, 661 n.6 (7th Cir. 2012) (quoting 1 U.S.C. § 112). Since this "chronological arrangement" becomes inefficient for researchers, the Office of Law Revision Counsel ("OLRC") codifies the Statutes at Large into the United States Code. *Id*. (citation omitted). "OLRC decides independently whether enacted text is placed in the main text [of the United States Code] or the notes." Jarrod Shobe, Codification and the Hidden Work of Congress, 67 UCLA L. REV. 640, 666 (2020).

The Statutes at Large—which includes the statutory notes—is federal law.  Thus, the United States Code merely constitutes as "prima facie" evidence of federal law.  *See* 1 U.S.C. § 204(a).  If a discrepancy exists between the Statutes at Large and the Code, the former controls. *See U.S. Nat. Bank of Or. v. Indep. Ins. Agents of Am., Inc*., 508 U.S. 439, 448 (1993) (citation omitted) ("Though the appearance of a provision in the current edition of the United States Code is 'prima facie' evidence that the provision has the force of law, it is the Statutes at Large that provides the 'legal evidence of laws'").  And federal courts regularly recognize that statutory notes carry the force of federal law.[4]

Ultimately, the tax identification number "requirement is important because it allows the IRS to readily ascertain the identity of the appraiser and whether he is in good standing with the IRS."  *Alli v. Comm'r*, 107 T.C.M. (CCH) 1082 (T.C. 2014) (finding that an appraisal was invalid because it did not comply with, among other things, 26 C.F.R. 1.170A–13(c)(3)(ii)(E)). Thus, the Keefers' appraisal—which lacks the appraiser's individual tax identification number (here, his social security number)—disobeys the statute.  This alone renders Keefers' Appraisal inadequate to support the charitable contribution deduction they claim.

---

[4] *See, e.g.*, *Nnadika v. Att'y Gen. of U.S*., 484 F.3d 626, 630 n.3 (3d Cir. 2007) ("The fact that the Note was never codified does not detract from its force." (citation omitted)); *Conyers v. Merit Sys. Prot. Bd*., 388 F.3d 1380, 1382 n.2 (Fed. Cir. 2004) ("[T]he fact that this provision was codified as a statutory note is of no moment."); *Schwier v. Cox*, 340 F.3d 1284, 1288 (11th Cir. 2003) ("The district court apparently believed that public laws have less 'weight' as laws than laws which have been codified.  The reverse is true."); *Millsaps v. Thompson*, 259 F.3d 535, 542 n.3 (6th Cir. 2001) ("Though not codified in the United States Code, this Act remains part of the Statutes at Large." (citation omitted)).

3.    *The IRS properly denied the Keefers' charitable contribution because their CWA neither specified the "exclusive legal control" language nor contained a merger clause*

Even if the Court were to accept that the anticipatory assignment of income doctrine does not apply, and that the Appraisal satisfied the statutory requirements, the Keefers' CWA still fails to comply with the statutory requirements for a charitable deduction.[5]  Without a valid CWA, the Court can deny their deduction.  *See Addis v. Comm'r.*, 374 F.3d 881, 887 (9th Cir. 2004) ("The deterrence value of section 170(f)(8)'s total denial of a deduction comports with the effective administration of a self-assessment and self-reporting system.").

To qualify for a charitable contribution exceeding $250, a taxpayer must obtain a CWA from the donee.  26 U.S.C. § 170(f)(8).   But in 2006, Congress amended Section 170 by inserting the new requirement for contributions to donor advised funds: "the taxpayer obtains a [CWA] . . . of such donor advised fund that such organization ***has exclusive legal control*** over the assets contributed."  *Id*. § 170(f)(18) (emphasis added); *see also* H.R. Conf. Rep. 109-455 (2006), 182, 2006 U.S.C.C.A.N. 234, 372 (noting that contributions to donor advised funds must have "[i]n addition to satisfying present-law substantiation requirements under section 170(f), a donor must obtain . . . a [CWA] from the [donor advised fund] has exclusive legal control over the assets contributed").

The IRS properly denied the Keefers' charitable contribution because they did not provide a CWA that contains the "exclusive legal control" language.  Donor advised funds, like

---

[5] The Keefers cannot invoke their substantial compliance and reasonable cause defenses to overcome a deficient CWA.  *See Campbell v. Comm'r*, 119 T.C.M. (CCH) 1266, *9, *10 n.16 (T.C. 2020) ("we have held on numerous occasions that the doctrine of substantial compliance does not apply with respect to the CWA requirements"); ("[T]his reasonable cause exception does not apply to the requirement of sec. 170 and the regulations thereunder that the taxpayer obtain a CWA").

Pi, must place the "exclusive legal control" language within the CWA.  *See* § 170(f)(18).  While

no court has addressed whether taxpayer can omit this statutory requirement, the general

statutory purpose to even have such an acknowledgment is "to assist the Internal Revenue

Service in processing tax returns on which charitable contribution deductions are claimed."  *See*

*15 W. 17th St. LLC v. Comm'r*, 147 T.C. 557, 564 (2016) (citation omitted).  Indeed, a year after

passing the law, Congress entertained hearings on Section 170(f)(18)'s impact where the

American Bar Association voiced its concerns about the written requirement.  *See* Tax-Exempt

Charitable Organizations: Hearing Before the H. Comm. On Ways & Means, 110th Cong. 55

(2007) (statement of Am. Bar Assoc. Section of Real Property) (quoting 26 U.S.C. § 170(f)(18))

("[The latest law] amended I.R.C. Sec. 170 to deny a charitable income tax deduction for a

contribution to a [donor advised fund] unless the charity's acknowledgment to the donor

***specifically states*** that the sponsoring organization 'has exclusive legal control over the assets

contributed.'" (emphasis added)).

Thus, the Keefers expect the IRS, which process millions of tax returns, to wade through

attachments to uncover and determine whether a taxpayer has delegated "exclusive legal control"

to the donor advised fund.  Such an expectation contravenes the statute's simplicity, which

serves "to ease the administration and audit of charitable contributions deductions."  *See Bruce v.*

*Comm'r*, 101 T.C.M. (CCH) 1739 (T.C. 2011) (stating purpose of CWA).  To effectuate Section

170(f)(18)'s another exclusive legal control requirement, the IRS should only be required to

consult the CWA.

Even if the Court were inclined to give credence that the words "exclusive legal control"

are not statutorily required, the Keefers' Acknowledgment still fails to show that Pi had

exclusive legal control.  Clearly, Pi was not even aware that it was not being given 4% of the

Partnership's cash reserves that were carved off by the alleged "oral agreement", or how much that value might have been.  Without that knowledge, Pi had no way of demanding control, much less exercising exclusive legal control, over that part of the property purportedly being donated but excluded from the appraisal.

Moreover, while a court can consider several documents collectively to form a valid CWA, they must contain a merger clause.  *See French v. Comm'r*, 111 T.C.M. (CCH) 1241 (T.C. 2016) (holding that multiple documents can form a CWA when "the deed contains a provision stating that the deed is the entire agreement of the parties").  Here, the Keefer Advisor Fund Documents include no mention that they constitute the entire agreement between the Keefers and Pi.  App. 084-098, Exs. 11 and 12 to Keefer Dep.  The lack of this merger clause is dispositive.  Without this merger clause, the IRS must guess whether another document exists that could wrestle the purported "exclusive legal control" from Pi and transfer it to the Keefers.  And that is precisely the case here.  Keefer and Pi allegedly entered into an oral agreement.  *See* App. 030-031, Ex. 1, Keefer Dep. 119-124 ln 12-7.  At least that is what Keefer says.  However, Pi was unaware of the terms of that oral agreement.  App. 464, Ex. 7, McCollough Dep., 53-54 ln 10-18.  So, the question becomes whether there was even a meeting of the minds on "exclusive legal control" and if there was, which assets or partnership assets such control applied.  The Government does not know the terms of this oral agreement and whether Pi would obtain "exclusive legal control."  Thus, the Keefers failed to provide a valid CWA.

The Keefers are therefore not entitled to a charitable contribution of $1,257,000, as they reported on their 2015 tax return, or a refund of income tax corresponding to this deduction, because their Appraisal and their CWA are flawed and do not meet the statutory requirements.

4.    _The Keefers attempts to excuse their inadequate substantiation are futile_

It is undisputed that the Appraisal values the wrong property and omits the appraiser's tax identification number.  Still, the Keefers provide two failing arguments to justify their omission: (i) invoking the oft-criticized substantial compliance doctrine; and (ii) relying on the reasonable cause defense.  These arguments both fail.

### i.    The Keefers have not met their burden to invoke substantial compliance

The Keefers argue that even if they did not strictly comply, they are nonetheless entitled to the benefit of deductions because they substantially complied.  "Substantial compliance" is a judicial doctrine derived from Tax Court. *See Bond v. Comm'r*, 100 T.C. 32 (1993).  This doctrine posits that courts must ask whether the requirement relates "to the substance or essence of the statute." *See, e.g, Bond v. Comm'r*, 100 T.C. 32, 41 (1993) (citation omitted).  If the requirement does relate to the substance or essence, then the taxpayer must strictly adhere. *See id.*  If the requirement does not, then the taxpayer may merely substantially comply. *See id.*

The Fifth Circuit cautioned that courts should sparingly apply the doctrine of substantial compliance, and "not allowed to spread beyond cases in which the taxpayer had a good excuse (though not a legal justification) for failing to comply with either an unimportant requirement or one unclearly or confusingly stated in the regulations or the statute." *See Est. of Hudgins v. Comm'r*, 57 F.3d 1393, 1404 (5th Cir. 1995).  This warning derives from the judicial doctrine's formlessness: "Distinctions between 'essential' requirements and 'procedural or directory' requirements . . . do not provide [courts] with much guidance" on how to apply substantial compliance. *See McAlpine v. Comm'r*, 968 F.2d 459, 462 (5th Cir. 1992); *but see Rigas v. United States*, 486 F. App'x 491, 499 (5th Cir. 2012) (determining in an unpublished opinion "if

the regulatory requirements in question are procedural, rather than substantive, such that the doctrine of substantial compliance may be applied").

The Fifth Circuit refined the Tax Court's substantial compliance rule with three elements: "[S]ubstantial compliance is achieved where the [1] regulatory requirement at issue [2] is unclear [3] and a reasonable taxpayer acting in good faith and exercising due diligence nevertheless fails to meet it." *McAlpine v. Comm'r*, 968 F.2d 459, 462 (5th Cir. 1992).

The Keefers cannot satisfy the first element; statutory requirements demand the property description and tax identification / social security number obligation. *See* 26 U.S.C. § 170(f)(8)(B)(i); § 155(a)(4)(A),(E), 100 Stat. 2095; 26 U.S.C. 170(f)(11)(E)(ii). This alone should end the inquiry.

The Keefers also fail to satisfy the second element. They cannot explain how "a description of the property appraised" and "TIN of such appraiser" are "unclear." *See* § 170(f)(8)(B)(i); § 155(a)(4)(A),(E), 100 Stat. 2095; 26 C.F.R. 1.170A–13(c)(3)(ii)(E).

Finally, the Keefers cannot satisfy the third element that they acted in good faith and exercised due diligence. The Keefers criticize IRS Form 8283 to show that they attempted to exercise due diligence but could not because of the Form's purported shortcomings. They are not the first taxpayers to levy complaints against Form 8283. *See Mohamed v. Comm'r*, 103 T.C.M. (CCH) 1814 (T.C. 2012). In *Mohamed*, the taxpayers argued that "the Commissioner's Form 8283 for 2003 and 2004 didn't indicate anywhere on it that a taxpayer had to get an independent appraisal for contributions worth more than $5,000 and presented conflicting messages about what could be filled out by the taxpayer and what required an appraiser's signature." *Mohamed v. Comm'r*, 103 T.C.M. (CCH) 1814 (T.C. 2012). But the Tax Court refused to "hold the form's failings against the Commissioner [t]here, because the authoritative

30

sources of Federal tax law are in the statutes, regulations, and judicial decisions . . . ." *Id*. (citation omitted). To be sure, a "taxpayer relies on his private interpretation of a tax form at his own risk." *Id*. "The fact that the form could be improved does not mean that it was misleading or that the instructions, or the applicable law, could be ignored." *Seely v. Comm'r*, 51 T.C.M. (CCH) 1087 (T.C. 1986). Thus, IRS Form 8283's alleged faults do not prove that the Keefers exercised due diligence. A simple review of Section 170 and its corresponding regulations would have easily revealed all of these requirements and that they must be provided with the tax return when it was filed. *See* 26 U.S.C. § 170(f)(8)(C) (contemporaneous written acknowledgment before return is filed or due); 26 U.S.C. § 170(f)(11)(D) (qualified appraisal submitted with returns); 26 U.S.C. § 170(f)(11)(E)(ii); 26 C.F.R. § 1.170A-13(c)(3)(B) (referring to definition of "qualified appraiser" in (c)(5)); 26 C.F.R. § 1.170A-13(c)(5) ("The term qualified appraiser means an individual …"); and 26 C.F.R. 1.170A–13(c)(3)(ii)(E) ("qualified appraisals" must contain appraiser's tax identification number).

The Keefers had both a CPA and a tax attorney who could have easily found these primary legal sources. However, they apparently were not asked to do so, or did not look for them. Moreover, even if the Keefers' had asked their tax advisors to thoroughly review all of their documents and the law on the charitable deduction they sought to claim, the Keefers failed to provide those tax advisors with all of the relevant facts. As such, the Keefers cannot claim that they acted in good faith. They did not inform their tax attorney, Horwitz, or their tax accountant, Weigand, that the Partnership was reserving its cash reserves from their purported donation, and that the cash reserves were to be excluded for purposes of the Appraisal. Neither Keefer nor the Partnership documented the oral agreement to reserve cash – thus it remained an oral agreement. While Weigand's testimony is clear that he was not tasked with review of the

31

Appraisal, it is equally clear that Horwitz was so tasked.  Keefer cannot now claim that he acted in good faith, having failed to provide Horwitz all of the information that he needed to review the Appraisal along with the Form 8283.  Horwitz testified he was fully unaware of such an oral agreement at the time of the donation and later, while the Appraisal was being prepared.  Aside from the issues that this lack of disclosure raises with respect to the Keefers' reliance upon a reasonable cause defense, Keefer's failure to provide this information in the context of a good faith analysis demonstrates that Keefer did not act in good faith with respect to the preparation of their Appraisal.

A line of cases that have developed surrounding the adequacy of qualified appraisals as required by Section 170 within the Tax Court.  Those cases – *Bond*, *Hewitt*, *Evenchik*, *Consol. Invs. Grp.*  – speak to the intent of the regulations, and the purpose of the appraisal requirements. *Bond v. Comm'r*, 100 T.C. 32 (1993); *Hewitt v. Comm'r*, 166 F.3d 332 (4th Cir. 1998) affirming *Hewitt v. Comm'r*, 109 T.C. 258, 259 (1997), aff'd, 166 F.3d 332 (4th Cir. 1998); *Est. of Evenchik*, 105 T.C.M. (CCH) 1231 (T.C. 2013); *Consol. Invs. Grp. v. Comm'r*, 98 T.C.M. (CCH) 601 (T.C. 2009).  Even if Plaintiffs are correct that the failure of Marshall to include his identifying number on his Appraisal is *de minimis*, what the Plaintiffs do not admit is that this is not the only failure of Marshall's appraisal.  The Appraisal appraises different property than that which was reported donated on the Plaintiffs' Form 8283.  The Appraisal references a 4% interest in the Partnership, subject to an oral agreement.  The Appraisal does not identify the oral agreement, and in fact the IRS had no opportunity to learn what assets were being carved out and reserved by Plaintiffs prior to making the alleged donation.  It was only during this litigation in Plaintiffs' July 2021 responses to its interrogatories that the United States learned that the oral agreement referenced cash reserves.  Plaintiffs state that cash reserves were being held for the

partners of the Partnership prior to the donation to Pi. In *Alli v. Commissioner*, T.C. Memo. 2014-15, at *56, the Tax Court explained that the purpose of the appraisal requirements is to "ensur[e] that the correct values of donated property are reported". *Emanouil v. Comm'r of Internal Revenue*, 120 T.C.M. (CCH) 146 (T.C. 2020) citing *Alli v. Commissioner*, T.C. Memo. 2014-15. Here the IRS could not have ascertained the value of the donated property because the cash reserves were not quantified or explained within the appraisal. In totality, therefore the Plaintiffs have not met their burden to invoke substantial compliance because they proceeded in bad faith – not even providing information about their oral agreement and cash reserves to their tax advisors – and their appraisal did not allow the IRS to evaluate the value of the property that they allege they donated.

### ii.    The Keefers have not met their burden to invoke the reasonable cause defense

Section 170(f)(11)(A)(ii)(II) contains a "reasonable cause" defense when a taxpayer skirts the qualified appraisal requirements. *See* 26 U.S.C. § 170(f)(11)(A)(ii)(II) (providing a defense when the "failure to meet such requirements is due to reasonable cause and not to willful neglect"). Since § 170 does not define reasonable cause, courts consider other tax code provisions and cases that apply the "concept of 'reasonable cause.'" *See Crimi v. Comm'r*, 105 T.C.M. (CCH) 1330 (T.C. 2013); *see also In re Canada*, 574 B.R. 620, 640 (N.D. Tex. 2017).

While taxpayers, like the Keefers, can rely on an attorney's or accountant's advice to invoke the reasonable cause defense, such invocation is not absolute. "Reliance on the advice of a professional tax adviser does not necessarily demonstrate reasonable cause and good faith; rather, the validity of this reliance turns on the quality and objectivity of the professional advice which they obtained." *Brinkley v. Comm'r*, 808 F.3d 657, 669 (5th Cir. 2015) (citation and alteration omitted).

When taxpayers, like the Keefers, claim to have relied on the advice of a professional, they must show that:

1. "the professional was a competent tax adviser with sufficient expertise to justify reliance,

2. [they] provided necessary and accurate information to the professional who gave [them] advice, and

3. [they] actually relied in good faith on that advice."

*See Pankratz v. Comm'r*, 121 T.C.M. (CCH) 1178 (T.C. 2021).

Above all, "[t]he most important factor is the extent of the taxpayer's effort to assess his proper liability in light of all the circumstances." *Brinkley v. Comm'r*, 808 F.3d 657, 669 (5th Cir. 2015). The Keefers bear the burden of proof. *See Brinkley*, 808 F.3d at 668.

### a. Competent Adviser

While "no precise threshold of competence that a tax adviser must have to justify reliance" exists, Weigand ("the Accountant"), and Horwitz ("the Lawyer") should be at least familiar with § 170: the statute addressing charitable contributions. *See Pankratz v. Comm'r*, 121 T.C.M. (CCH) 1178 (T.C. 2021). Although the Lawyer attests reading § 170, the Accountant does not.

### b. Provision of All Relevant Information

The Keefers have the burden of proving what they told the tax adviser and what the tax adviser told them. *See Green v. Comm'r*, 507 F.3d 857, 872 (5th Cir. 2007) (affirming the denial of the defense where, *inter alia*, "there was no evidence as to what [the taxpayer] told the preparer, what the preparer told [the taxpayer], and whether or not [the taxpayer's] reliance on any advice from the preparer was reasonable"). The Keefers cannot rely on a tax professional's

advice if they fail "to disclose a fact that [they] know[ ], or reasonably should know, to be relevant to the proper tax treatment of an item." *See Prudhomme v. Comm'r*, 345 F. App'x 6, 11 (5th Cir. 2009) (citation omitted).

*Accountant*:  The Accountant was unaware of the oral agreement between Keefer and Pi. App. 511-512, Ex. 8, Weigand Dep., 85-89 ln 9-18.  The Keefers do not explain how they could have relied on the Accountant and Lawyer's advice, as they allege in their dispositive motion [Dkt. #26-1 at 25], regarding the proper tax treatment of their Pi-donation if they failed to provide the Accountant with the information of the oral agreement.  "It is not reasonable for [the Keefers] to rely on [their] tax advisers where [they] had knowingly obscured the complete picture of [their] tax situation from them." *See Brinkley v. Comm'r*, 108 T.C.M. (CCH) 499 (T.C. 2014), aff'd, 808 F.3d 657 (5th Cir. 2015).  The Accountant was not aware of the oral agreement, nor he did not review the Appraisal.  At no point did the Accountant inquire about the oral agreement.

The Accountant testified that he did not provide an opinion letter.  App. 533, Ex. 8, Weigand Dep. 171 at 10-15.  "The mere fact that a certified public accountant has prepared a tax return does not mean that he or she has opined on any or all of the items reported therein." *Neonatology Assocs., P.A. v. Comm'r*, 115 T.C. 43, 100 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

*Lawyer*: The Lawyer was unaware of the oral agreement between Keefer and Pi.  App. 351-352, Ex. 5, Horwitz Dep. 168-172 ln 13-3.  The Keefers "submitted no opinion letters, and no correspondence detailing advice or suggestions that [their] accountants [and Lawyer] provided.  *See Losantiville Country Club v. Comm'r*, 906 F.3d 468, 476 (6th Cir. 2018) (finding no reasonable cause defense); App. 553, Ex. 9 (RFP #17)).  *Compare Southgate Master Fund,*

*LLC ex rel. Montgomery Cap. Advisors, LLC v. United States*, 651 F. Supp. 2d 596, 668 (N.D. Tex. 2009) (finding reasonable cause when that the taxpayer "sought legal advice from qualified accountants and tax attorneys concerning the legal implications of their [sic] investments and the resulting tax deductions and hired professionals to write ***two*** detailed tax opinions" (emphasis in original)).

      c.  <u>Good Faith Reliance on Advice</u>

"The reliance must be objectively reasonable." *Chamberlain v. Comm'r*, 66 F.3d 729, 732 (5th Cir. 1995) (citation and footnote omitted).  The Court "may consider the taxpayer's experience, knowledge, and education" in evaluating whether good faith reliance took place. *See Hatcher v. Comm'r*, 726 F. App'x 207, 218 (5th Cir. 2018); *Prudhomme v. Comm'r*, 345 F. App'x 6, 11 (5th Cir. 2009).  Here, the Keefers have significant experience, both having practiced as accountants, and Keefer in operating and managing several businesses in the hospitality sector since 2005.  App. 004, Ex. 1, Keefer Dep., 13-14 at 3-8; App. 243, Ex. 2, Patricia Keefer Dep., 9-12 at 13-18.

It was not objectively reasonable for the Keefers to have relied on tax advisors who they failed to provide information about a side oral agreement that purportedly carved off the Partnership's existing cash reserves from a partnership interest allegedly being donated to a charity.  As persons with accounting and business experience, they knew or should have known that the exact nature property for which a charitable deduction will have an impact on its value and the amount of deduction they may be entitled to claim on their tax return.

     *5.*     *The Keefers' citations to IRS employees analyses and audit notes are irrelevant as to whether the appraisal was sufficient according to the Fifth Circuit's rulings regarding the de novo standard of review.*

In addition, the Keefers have previously cited and included in their appendix workpapers of the IRS employee, and cite to the IRS employees' reasoning and check marks as one basis upon which they reach their conclusion that their appraisal was sufficient.  *See* Dkt. 53, Plaintiffs' Motion at 10-11.  Again, as discussed in detail above, "any record made in the Service, including the reasons for the [the tax] assessment, is irrelevant…." *Id*. at n. 33.  *See also King v. United States*, 641 F.2d 253, 259 (5th Cir. 1981) (IRS "theory" immaterial in subsequent refund suit); *Vons Companies v. United States*, 51 Fed. Cl. 1, 6 (2001) (*citing Lewis v. Reynolds*, 284 U.S. 281, 283 (1932)).  The Keefers retain their burden to prove why their appraiser's appraisal lacked the information required under the applicable Treasury Regulations.

     *6.*     *IRS Form instructions do not serve as a substitute for Treasury Regulations regarding the qualified appraisal that the Keefers were required to submit.*

The Keefers have also previously argued that their appraisal met the regulation requirements is based not their appraisal, but the Form 8283.  The Keefers attach Instructions to Form 8283, as revised in November 2019, to their appendix and turn the Court's attention to the Form's requirements to substitute for requirements within Treasury Regulations.  While Form 8283 is published by the IRS, as well as its instructions, the instructions to Form 8283 do not serve as a substitute for the Treasury Regulations, and the requirements for qualified appraisals as defined therein.  Instead, the Instructions for Form 8283 are separate and distinct from the Treasury Regulations that address qualified appraisals.  Here, the Keefers' Form 8283 only includes the taxpayer identification number of Katzen, Marshall & Associates, Inc. and not of the appraiser, Marshall.  Furthermore, the appraisal lacks both – neither Marshall's taxpayer identification number nor Katzen, Marshall & Associates, Inc.'s taxpayer identification number

are listed in the appraisal.  The defect of the Keefers' Appraisal is not surprising however as Marshall confirmed in his deposition that before he completed his Appraisal, he had not reviewed the requirements in 26 CFR 1.170A-13 and was therefore unaware of the requirement. Dkt. 51-4, App. 378-379, Ex. 6, Marshall Dep., 35-39 ln 24-39.

**Issue C.    The bargain sale element of this transaction, under 26 U.S.C. §1011(b), applied to the Keefers' transactions has different results depending on which issues the Keefers or the United States prevail upon.**

As part of its audit determination, the IRS assessed an additional tax for the bargain sale portion of the donation of a 4% partnership interest.  The Keefer's paid that additional tax when they paid the rest of the audit deficiency.  Based on Agent Dunford's computations completed as the request of the undersigned counsel for the United States it is now clear that the gain on the bargain sale will need to be reversed under all potential scenarios regardless of which party wins Issues, A, B, C or D.  However as shown in Agent Dunford's computations the removal of the gain on the bargain sale does not always equate to a tax refund for the Keefers.  This is the case in Scenario 2 where no refund is allowed because there is a larger adjustment in the other direction for anticipatory assignment of income.  App. 656.  This is also partially true for her Scenario 1 computation where the denial of the charitable donation and removal of the bargain sale gain results in a partial refund of $136,875.  App. 640.  The Keefers are barred from any relief under Scenario 3, but if the Court were to disagree, Agent Dunford's computation for Scenario 3 removes the gain on the bargain sale.  App. 673.  Finally, if the Keefers were to prevail on their claim for a charitable donation of a 4% partnership interest, the United States agrees that they computed the gain and corresponding tax on the bargain sale correctly and any IRS's adjustment to that gain should be reversed which would in turn generate the refund they have alleged they are entitled.

**Issue D.  The doctrine of variance bars any relief to the Keefers if they were to claim that they are entitled to a charitable contribution deduction for making a cash donation to Pi.**

The Keefers are similarly not entitled to a charitable contribution deduction for their alternative claim that they donated $1,280,000 cash to Pi because they did not include that ground in their administrative claim for refund and it is now barred by the doctrine of variance. 26 U.S.C. § 7422(a) requires that tax refund claims comply with "the regulations of the Secretary established in pursuance thereof."  *Rodgers v. United States*, 843 F.3d 181, 195 (5th Cir. 2016). 26 C.F.R. § 301.6402–2(b)(1) (emphasis added) provides:

> The claim must set forth in detail ***each ground*** upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the ***exact basis*** thereof ... A claim which does not comply with this paragraph will not be considered for any purpose as a claim for refund or credit.

"[T]his regulation codifies the variance doctrine."  This means that "[a]bsent a waiver by the Government, a taxpayer is barred from raising in a refund suit grounds for recovery which had not previously been set forth in its claim for a refund."  *Rodgers*, 843 F.3d at 195.  The Supreme Court, the Fifth Circuit and other courts agree that both the grounds and the amount of the refund sought must be stated.  *United States v. Felt & Tarrant Mfg. Co*., 283 U.S. 269, 272, (1931) (The statute requiring a duly filed refund claim is not satisfied by the filing of a paper which gives no notice of the amount or nature of the claim for which the suit is brought). *Alabama By-Prod. Corp. v. Patterson*, 258 F.2d 892, 900 (5th Cir. 1958) (All grounds upon which a taxpayer relies must be stated in the original claim for refund so as to apprise the Commissioner of what to look into; the Commissioner can take the claim at its face value and examine only those points to which his attention is necessarily directed).  *United States ex rel. Endicott v. Mellon*, 39 F.2d 505 (D.C. Cir. 1930) (Claim for "$1 or such greater amount as is legally allowable" is inadequate).

A claim which does not comply with these minimum requirements will not be considered for "any purpose"—which includes satisfying the jurisdictional prerequisites for maintaining a refund suit under 26 U.S.C. 7422(a). 26 C.F.R. § 301.6402-2(b)(1) (emphasis added); *Young v. United States*, 609 F. Supp. 512, 516 (N.D. Tex. 1985). This specificity requirement is designed to prevent "wasteful fiscal administration by barring *incomplete* or confusing claims." *Angelus Milling Co. v. Comm'r*, 325 U.S. 293, 297 (1945)(emphasis added); *see also United States v. Hancock Bank*, 400 F.2d 975, 981 (5th Cir. 1968). Thus, courts throughout the Fifth Circuit have consistently required strict compliance from taxpayers. *Trans-Serve, Inc. v. United States*, 2003 U.S. Dist. LEXIS 24245 at *9 (W.D. La. 2003); *Richardson v. United States*, 330 F. Supp. 102, 105 (S.D. Tex. 1971)("[P]olicy dictates that [sovereign immunity] exceptions must be strictly construed, requiring compliance with even purely formal or technical conditions") (emphasis added); *Sheshunoff v. United States*, 2013 U.S. Dist. LEXIS 180879 at *28 (W.D. Tex. 2013)("These regulations define the claimant's rights and are to be strictly construed in favor of the government.") (emphasis added); *Doe v. United States*, 398 F.3d 686, 690 (5th Cir. 2005)("[A]s a general matter, the Internal Revenue Code is to be interpreted broadly in the Government's favor . . . [and] statutes diminishing sovereign immunity should be read in the sovereign's favor.") (citations omitted); *Mallette Bros. Constr. Co. Inc. v. United States*, 695 F.2d 145, 155 (5th Cir. 1983) ("The alleged error must be clearly and specifically set forth in the refund claim. A generalized plea . . . will not suffice."). S*ee also El Paso CGP Co. v. United States*, 748 F.3d 225 (5th Cir. 2014); *Dotson v. United States*, GC-87-85-D-O, 1988 U.S. Dist. LEXIS 19486 at *11 (N.D. Miss. 1988) ("Other circuits may be more lenient . . . in order to find that the requirements of the statute and regulations are satisfied. The court, however, is controlled by decisions of the Fifth Circuit and is not persuaded[.]").

Failure to set forth the alleged error in the refund claim jurisdictionally bars its inclusion in the suit. *See Mallet Bros. Constr. Co. v. United States*, 695 F.2d 145, 155 (5th Cir. 1983). The purpose of this jurisdictional requirement is to ensure "that the Commissioner is apprised of the exact nature of the claim and the facts upon which the claim is advanced so that there is an opportunity to make an administrative determination of the claim." *Mallette Bros. Const. Co*., 695 F.2d at 155 (citations omitted).

The Keefers' transfer of net cash of $1,277,000 to their Keefer Donor Advised Fund with Pi does not entitle them to a deduction for a cash contribution under Section 170 when they failed to state that a cash donation to Pi was the basis for their claim for refund and they failed obtain a contemporaneous written acknowledgement describing the property that they donated was cash, and without specifying the amount. The attachment to their amended tax return provides an explanation of the reason for their amendment and claim for refund but lacks an explanation that the Keefers donated cash to Pi, and that they are therefore entitled to a charitable contribution for donation of cash. App. 560. Additionally, a CWA is required whether the purported donation was one of cash or non-cash property. 26 U.S.C. § 170(f)(8)(b)(i). The Keefers have not provided a CWA for a cash donation. Furthermore, the corollary to claiming a deduction for a donation of cash is that the Keefers would have been forced to recognize gain on the sale of their entire interest in the Partnership's asset. The Keefers specifically did not do so because as Keefer testified, one of the goals was the reduce his anticipated tax liability on the sale of the hotel, while also obtaining the benefit of a charitable contribution deduction.

Therefore, the Keefers cannot now claim that they are entitled to a refund based on a cash charitable deduction of $1,277,000, because (1) they do not have a CWA as required by statute and (2) any such argument they might now raise is barred by the doctrine of variance.

41

## IV. CONCLUSION

For the reasons given, the United States moves the Court to grant its Amended Motion for Summary Judgment.   The Keefers are not entitled to any income tax refund for tax year 2015 because the Keefers' purported charitable contribution of a limited Partnership interest was a transaction to which the anticipatory assignment of income doctrine applies.  Alternatively, if the Court finds that the assignment of income doctrine does not apply, the Court should still find that the Keefers are not entitled to a charitable deduction because they donated property different from what they appraised, the appraisal of their purported donation does not comply with statutory substantiation requirements, and their purported donation is not supported by the statutorily required contemporaneous written acknowledgment of "exclusive legal control" language nor contained a merger clause.  If the Court makes this alternative finding, the Keefers will be entitled to only $136,875 of the refund they seek because the United States acknowledges in this alternative scenario the gain from the bargain sale previously imposed by the IRS should be reversed.  However, in no circumstance should the Court find that the Keefers are entitled to any refund based on their recently plead alternative theory that they contributed cash to the Pi Foundation.   A refund based on such an alternative theory is barred by the doctrine of variance and the Court lacks jurisdiction to grant it.  A cash donation also fails for the same substantiation requirements mentioned above.

Dated:  November 16, 2021    DAVID A. HUBBERT
           Deputy Assistant Attorney General

           Moha P. Yepuri
           Texas State Bar No. 24046651
           Christian A. Orozco
           Texas State Bar No. 24107886
           U.S. DEPARTMENT OF JUSTICE - TAX DIVISION
           717 N. Harwood St., Suite 400
           Dallas, Texas 75201
           (214) 880-9767/(214) 880-9757
           (214) 880-9741 (Facsimile)
           Moha.P.Yepuri@usdoj.gov
           Christian.A.Orozco@usdoj.gov

           ATTORNEYS FOR UNITED STATES

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on November 16, 2021, a copy of the forgoing was electronically filed on

the CM/ECF system, which will automatically service a Notice of Electronic Filing on the

following attorney in charge for Plaintiffs:

GLAST, PHILLIPS & MURRAY, P.C.
Kenneth M. Horwitz
kmh@gpm-law.com
Richard E. Young
ryoung@gpm-law.com
14801 Quorum Drive, Suite 500
Dallas, Texas 75254

*/s/  Moha P. Yepuri*
Moha P. Yepuri
Trial Attorney, Tax Division

44