IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KEVIN M. KEEFER & PATRICIA S. KEEFER, | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Case No.: 3:20-cv-00836-B |
| UNITED STATES OF AMERICA, | § § | |
| *Defendant*. | § § | |

## UNITED STATES' REPLY TO THE KEEFERS' RESPONSE TO THE UNITED STATES' AMENDED MOTION FOR SUMMARY JUDGMENT

The United States replies to the Keefers' Response to the United States' Motion for Summary Judgment. Despite the Keefers' attempt to blame the IRS and criticize the United States to draw attention away from their disguised donation of taxable income and failure to substantiate their alleged charitable donation, this case is very simple.

This is a suit for refund of taxes based on a charitable deduction claimed by the Keefers on their 2015 income tax return. In refund suits, the Court reviews the facts and the law on *de novo* basis. The Keefers also bear the burden of proof to establish their right to the charitable deduction and the amount of the refund they seek. But the Keefers' refund must be denied because it relies on two inconsistent positions. First, their position as to whether the application of the anticipatory assignment of income doctrine applies is that they donated a 4% interest in the Partnership, and that they did not carve out income or a partial interest from this alleged donation of a Partnership interest. Their second position as to whether they are entitled to a charitable contribution deduction relies on their appraisal which appraises a different asset –a percentage of the anticipated net cash from the sale of an asset owed by the Partnership. The alleged donated asset in their first position differs from that of their second position, and they cannot allege

different assets were donated, as it suits their individual arguments. Their positions are inconsistent and their refund should be denied.

As explained below, the Keefers cannot avoid the anticipatory assignment of income doctrine because their own appraisal unequivocally demonstrates that the item donated was 4% of the net cash from the sale of the Partnership's only operating asset – a hotel – which generated taxable income (gain on sale) flowing through the Partnership to its partners. Despite the labels used, there must be, in fact and in substance, a transfer of a partnership interest in order to sever this taxable income from the Keefers and send it to Pi, their charitable Foundation, and this donation of a partnership interest must occur before the sale of the hotel was sufficiently certain. Their appraisal does not attempt to value the Partnership or even a 4% interest in the Partnership. This was because there was a side oral agreement that modified everything. Their appraisal was based only on the net cash proceeds as stated in the Closing Statement for the hotel sale. If their appraisal is to be believed, the Keefers did not actually donate a partnership interest and there was nothing to sever ownership of their anticipated income.

However, if the Keefers are able to convince the Court that they donated a 4% partnership interest to Pi then they have no appraisal to substantiate that donation. A close inspection of the substance of the appraisal demonstrates that it values something entirely different than a partnership interest. It values a percentage of the anticipated net cash from the sale of an asset owed by the Partnership. The Keefers cannot have it both ways, and because they did not assert a cash donation as an alternative ground for their refund claim at the administrative level, their refund suit based on an alleged donation of a 4% partnership interest must be denied.

2

I.    **The United States' Issue A:  The Anticipatory Assignment of Income Doctrine applies to the Keefers' transaction**

In their Response, the Keefers attempt to explain why the anticipatory assignment of income doctrine does not prevent them from obtaining a refund based on an alleged donation of a partnership interest to Pi before their Partnership sold its only operating asset and generated a taxable partnership income that would have otherwise passed through them as partners.  The argue, as they must, that their donation was a 4% interest in their Partnership before the income from the sale of the hotel was generated inside of the Partnership.  However, because the rules for charitable deductions also require that the Keefers substantiate their alleged donation with a qualified appraisal, they also rely, as they must, on an appraisal prepared by David T. Marshall.  The appraisal was not for a 4% interest in the Partnership.  First, it is described as being for a "4.000% limited partnership interest, ***subject to an oral agreement***," App. 205, Ex. 15 to Keefer Dep. (emphasis added).  The oral agreement changes everything.  The oral agreement immediately removes any ability for the Keefers to argue that they donated an entire 4% interest in the Partnership.  Further, a closer inspection of the contents of the appraisal involving the impact of that oral agreement reveals that the only item being valued for a donation purposes was 4% of the net cash proceeds from the anticipated $54 million sale of the Partnership's hotel asset.  "By oral agreement, the Foundation and Donor agreed that the Foundation ***would only share in the proceeds from the Seller's Closing Statement***; the Foundation would not receive its pro rata share in the other net assets of the Partnership."  App. 209, Ex. 15 to Keefer Dep. (emphasis added).  "We have been informed that the Donor and Donee have an agreement that the Donee ***will only share in the next proceeds from the Seller's Closing Statement***.  The Donee will not share in Other Assets of the Partnership not covered in the sale."  App. 212, Ex. 15 to Keefer Dep. (emphasis added)  In other words, Pi (a § 501(c)(3) foundation that establishes donor

3

advised fund for donors)) did not share in any of the Partnership's other assets or liabilities like a true partner would have.

The methodology used by the appraiser confirms that the only thing being donated was a percentage of the net cash from the sale of the hotel. The appraisal did not determine the value the hotel as one of the Partnership's assets or the potential income to be earned by the Foundation from that hotel if it did not sell. Instead, the appraisal focused, as required by the "oral agreement" exclusively on the Closing Statement to determine the value of the net cash proceeds to be received from the sale of the hotel.[1] App. 209, Ex. 15 to Keefer Dep.; App. 229-230, Ex. 15 to Keefer Dep. In sum, the oral agreement nullified everything that the Keefers want this Court to believe they donated.

In their Response, the Keefers argue that the oral agreement pertained only to cash reserves that were set aside to pay "preexisting [partnership] liabilities to pre-existing partners for previously delayed distributions." Response at 13-16. However, this argument is supported only by the vague deposition testimony of Mr. Keefer and is contradicted by numerous statements made in their own appraisal[2] showing that everything except the anticipated net cash from the sale of the hotel was excluded from the donation by the oral agreement. For example, "Donor and Donee have an agreement that the Donee **will only share in the next proceeds from the Seller's Closing Statement**. The Donee will not share in Other Assets of the Partnership not covered in the sale." App. 212, Ex. 15 to Keefer Dep. (emphasis added). This explanation of the oral agreement says nothing about setting aside cash reserves for pre-existing partnership

[1] There were also minor adjustments to the value of the net cash proceeds for the probability that the sale would not take place and time value of money.

[2] As noted above, the Keefers cannot disavow their own appraisal and still meet the statutory substantiation requirements for a charitable deduction of property.

liabilities to pre-existing partners.  Moreover, the Keefer's alleged "pre-existing partnership liability" explanation for the oral agreement is mathematically contradicted by the balance sheet information listed in their appraisal.  They would have this Court believe that certain amounts of the Partnership's cash were excluded from the donation because that cash was needed to cover a pre-existing liability of the partnership for distributions.  If these were truly partnership liabilities they would be reflected on the Partnership's balance sheet as a liability and netted against its cash.  Yet, the Partnership Balance Sheet shows total cash of $813,000, and only one potential liability category for $176,000 of "Other Liabilities" that could possibly relate to a pre-existing liability to partners for distributions.  App. 207, Ex. 15 to Keefer Dep.  All of the other categories of "Current Liabilities" have descriptions showing they are not a liability to partners for distributions.  Even on a combined basis the Total Current Liabilities are only $528,000 and do not justify withholding all $813,000 of cash from the donation as the Keefer's contend was the oral agreement's limited purpose.  The Long Term Debt of $21,698,000 on the Balance Sheet clearly relates to the Wells Fargo Commercial Mortgage of $21,644,933 on the Closing Statement for the hotel, and even if the small $53,067 difference between these two amounts somehow related to a partnership liability to the partners it does support withholding $813,000 of cash as the Keefers contend was the oral agreement's limited purpose.

In sum, because the Keefers must rely on their appraisal, they cannot avoid the clear language in that appraisal about the impact of the oral agreement to the alleged donation.  For the same reasons, they cannot avoid the anticipatory assignment of income doctrine triggered by that oral agreement.

The Keefers reliance on *Humacid Co. v. Commissioner*, 42 T.C. 894, 913 (1964)[3] is distinguishable on its facts.  In *Humacid*, the Tax Court found the anticipatory assignment of income doctrine did not apply and the taxpayers were not required to report income based on the redemption of stock by donees because there was no binding obligation that it be redeemed.  *Id*. *Humacid* may be distinguished since no definite prearrangement was found by the court in that case.  *In Re: Alvin A. Behrend, et Ux. v. United States Maxwell A. Behrend, et Ux.*, 1973 WL 34667 (Jan. 29, 1973).  The Keefers, however, had pre-arranged a plan to donate their partnership interest to Pi, and then shortly thereafter, sell the Partnership's major asset – the hotel.  Keefers' email dated May 20, 2021, outlines his plan, as shown below.  App. 18-19, Keefer Dep. 72-76, ln 14-5, App. 66, Ex. 6 to Keefer Dep.



**Kevin Keefer**

| | |
|---|---|
| From: | Scott M. McCullough <smccullough@cnmlaw.com> |
| Sent: | Wednesday, May 20, 2015 2:53 PM |
| To: | Lee S. McCullough; Jeremy Andrus; Kevin Keefer; Weigand@gucpas.com; KMH@gpm-law.com; Hokan Olausson |
| Cc: | Brent Andrus; Gregory C. Zaugg; Tony Wolff (tony@adamssmithcpa.com); Jill Corrigan (jill@adamssmithcpa.com) |
| Subject: | re LLC interest transfer |

I have copied in our CPA into this email chain as I think we will need their input as to this transaction.  Let me outline what the steps would look like and the issues:

**Issues**

1. UBTI, I think we all agree that there may be some UBTI during the short period of time that we hold the interest prior to closing, which would need to be calculated and paid from the proceeds prior to the proceeds being sent to the charity of the donors choice.
2. The big question is how does the debt change this, if at all.  It appears the debt has been in place for more than 5 years.  I will ask our CPA to confirm the research that you did and sent to us.

**Process**

1. Fill out the PI donor information forms for each donor
2. Determine what exactly will be donated
3. Assign the interest to the PI fund –
   a.  Get a valuation on the interest donated to substantiate the deduction
4. Amend the partnership agreement to show the PI fund as a partner
5. Include the Pi fund as a seller on the purchase agreement
6. Allow the pi fund attorneys to review the agreement and modify if needed
7. Sell the donated asset
8. Collect the funds and pay the Pi fund fees
9. Give funds to the public charity of the donors choosing or hold in an investment account in the name of the pi fund at the broker of the donor's choosing.

Does this sounds about right?

GOVERNMENT

---

[3] In their Response, the Keefers cite to both *Humacid* and *Hudspeth*.  These are both pre-2015 decisions and show that the anticipatory assignment of income was a well-known ground for denying a charitable deduction of appreciated property.  Accordingly, the Keefers have no grounds to claim they were surprised when government argued early in this case that their transaction may be subject to the anticipatory assignment of income doctrine.  Similarly, they have no excuse for failing to assert an alternative ground in their administrative claim for refund based on a cash donation.

Additionally, on the law, *Humacid* stated the rule of anticipatory assignment of income as follows: "A gift of appreciated property does not result in income to the donor so long as he gives the property away absolutely and parts with title thereto before the property gives rise to income by way of a sale." *Id* at 913. Here, the appraisal relied on by the Keefer's makes it clear they what they gave the Foundation was amount equal to 4% of the net cash on the anticipated sale of the hotel, but not a true interest in the Partnership through which that income flowed.

The Keefers reliance on *Dickinson v. Commissioner*, No. 9526-19, 2020 Tax Ct. Memo LEXIS 122, at *9 (T.C. Sep. 3, 2020) is also misplaced. There, the ultimate question was whether the redemption and the shareholder's corresponding right to income had already crystallized at the time of the gift. In *Dickinson*, there was no dispute that shares of stock with full ownership attributes had been gifted. Here, the Keefer's own appraisal that takes into account their side oral agreement and shows that they did not donate a true partnership interest that severed their right to a certain percentage of income. Instead, their appraisal shows that the gift, as modified by the oral agreement, was to give away 4% of the net cash from the sale of one of the Partnership's assets.

The Keefers further allege that the United States misunderstands the difference between a partnership interest and partnership property, and they continue to cite cases to which the anticipatory assignment of income is not directly at issue such as *Moore*. *Moore v. Comm'r of Internal Revenue*, 70 T.C. 1024, 1028 (1978). First the United States notes that the anticipatory assignment of income doctrine applies more easily to the Keefers because a partnership is a flow-through entity, and in this case, the Partnership's planned and upcoming sale of the hotel would necessarily result in taxable income (gain on sale of partnership assets) flowing through to

7

the holders of partnership interests.  Additionally, the anticipated gain on the sale of the

Partnership asset is what the Keefers wanted to avoid.  Unless they donated a real partnership

interest to Pi, the income from the sale of its hotel asset was still attributable to the Keefers.  The

oral agreement modified any alleged gift of a partnership interest and gave Pi only a percentage

of the net cash the Keefers would have otherwise received from the sale of the hotel.  This is the

classic assignment of income.

The Keefers also rely on *Moore*.  In *Moore*, the principal issue was whether, for Federal

tax purposes, a partnership agreement could be modified to retroactively allocate partnership

losses to a partner when those losses had accrued prior to such partner's entry into the

partnership. *Moore v. Comm'r of Internal Revenue*, 70 T.C. 1024, 1028 (1978).  *Moore* is

distinguishable because the partnership interest was sold and not donated.  The reference in

*Moore* to anticipatory assignment of income is also not applicable because it applies to the

*Moore's* interpretation of section 706(c)(2)(B).  The Plaintiffs' quote from *Moore* cites the

concurring opinion, and overall the case is not on point because it interprets partnership statutes

and does not address a charitable contribution.

The Keefers Response also misstates the timing of the transaction.  "Over the next couple

of months thereafter, the partnership contracted to sell and then sold its hotel."  This description

of the timing is not accurate.  The valuation date in the appraisal was June 18, 2015, and the

contract date was July 2, 2015.  As shown above, the sale of the hotel was contemplated far in

advance of those dates along with the donation to Pi, as per Keefer's email dated May 20, 2015,

before the alleged donation to Pi in June 2015.  The sale was quite unlikely to fail based on the

Keefers' own appraiser, as well as the statements of Keefer himself.  Keefer admitted that as of

the valuation date of the Keefers' appraisal, June 18, 2015, he was not aware of any material fact

or condition that would change or derail the sale. App. 028, Ex. 1, Keefer Dep., 111-113 at 22-11; App. 210, Ex. 15 to Keefer Dep. Even Pi understood that the plan was that Pi would receive cash, because Pi is not in the business of holding long-term positions in any assets. App. 388, Ex. 6, Marshall Dep. 75 ln 5-14.

Finally, the Keefers cite cases regarding the donation of stock, and related redemptions. As the Tax Court pointed out, in the majority of the anticipatory assignment of income cases, some kind of formal shareholder vote (approving a merger, liquidation, or distribution) had occurred by the time that the stock was deemed to have ripened. *Ferguson v. Comm'r*, 174 F.3d 997, 1004 (9th Cir. 1999). Here, there was no stock involved. According to the Keefer's own appraisal, they donated 4% of the net cash to be received on the sale of the Partnership's hotel. But even if they donated a real partnership interest, they planned this transaction along with three other partners in the partnership, and four partners did in fact make similar donations to Pi. App. 384, Ex. 6, Marshall Dep. 57 ln 11-14. Therefore, while there were no shareholders to vote on a redemption of stock, four partners to this partnership (which had seven partners) planned their donations in conjunction with the anticipated liquidation of the hotel. The Keefers' Partnership existed to run and operate one asset – a hotel that was being sold. The Partnership was dissolved in 2015. Similarly, in *Hudspeth v. United States*, 471 F.2d 275, 276 (8th Cir. 1972), the court recast a stock donation as a taxable stock sale and donation of the sale proceeds where the taxpayer donated stock after the issuing corporation's directors and shareholders had adopted a plan of complete liquidation. Here, it is undisputed that the Keefers and other partners had already decided to liquidate the Partnership's main asset and dissolve the Partnership. The circumstances of their transaction are more similar to the facts in *Hudspeth*. *Id*. And retention by the taxpayer of risk of loss and full control of the property, such as discretion over the

distribution or investment of the assets, obviates any effective transfer. *Salty Brine I, Ltd. v. United States*, 2013 U.S. Dist. LEXIS 98509, at *41, 111 (N.D. Tex. May 16, 2013).  The Fifth Circuit has also reviewed the level of control maintained by alleged donors in determining that the assignment of income was appropriate.  *Salty Brine I, Ltd. v. United States*, 761 F.3d 484, 493 (5th Cir. 2014).  Here the Keefers and other partners maintained control over the Partnership assets after the alleged date of donation, not Pi.

## II.    The United States' Issue B: the Keefers' Appraisal is not a qualified appraisal as defined under the Treasury Regulations for Section 170

### 1.  The property allegedly donated by the Keefers was not adequately described in the appraisal.

To qualify for a charitable contribution deduction, the taxpayers must accurately describe the donated property.  *See* 26 U.S.C. § 170(f).  Congress required this description in two places: the contemporaneous written acknowledgement (CWA) and the appraisal.  The CWA must include "a description (but not value) of any property other than cash contributed."  § 170(f)(8)(B)(i).  And the Appraisal must also include "a description of the property appraised." Pub. L. 98-369, § 155(a)(4)(A), as amended Pub. L. 99-514, § 2 (1986), 100 Stat. 2095 (codified as a note to 26 U.S.C. § 170). "The description requirement is important, indeed essential, to the review of charitable contribution deductions and the reliability of corresponding appraisals." *Campbell v. Comm'r*, 119 T.C.M. (CCH) 1266 (T.C. 2020) (citation and alterations omitted). "Absent a description of the contributed property, the appraisal and its valuation of the donated property are meaningless."  *Id*.

In their Response, the Keefers lump together the Form 8283 along with the paper attachment and the appraisal that they attached to their return in an attempt to satisfy the statutory requirement that the property that they allege they donated was described accurately. Their attempt fails however because there is no single document that explains fully and

adequately the property they allege to have donated.  In each successive assignment—from Burbank HHG Associates, LP to Keefer and then ultimately to Pi—all reflect an alleged donation of a 4% interest in the ***entire*** Partnership.  *See* App. 443–450, Ex. 13 to Marshall Dep. And Pi too characterizes Keefer's donation as one consisting of 4% of the entire Partnership. *See* App. 084, Ex. 11 to Keefer Dep.; App. 098, Ex. 12 to Keefer Dep.  Above all, the description in IRS Form 8283, Noncash Charitable Contributions, which the Keefers attached to their 2015 income tax return, describes the donated property as 4% of the limited partnership interest in the Partnership.  App. 542, Ex. 10 to Weigand Dep.

However, the Keefers submitted an appraisal of something different than the property described in the CWA and Form 8283.  *Compare* App. 205, 209 with App. 542.  In other words, if the Keefers actually donated a 4% partnership interest, they "had the wrong asset appraised." *See Est. of Evenchik v. Comm'r*, 105 T.C.M. (CCH) 1231 (T.C. 2013) (finding that a charitable deduction was properly denied when a taxpayer, among other things, appraised a property different from the one donated).  Rather than value a 4% interest in the ***entire*** Partnership, the appraisal values a 4% of the net cash proceeds from the Closing Statement for the sale of the Partnership's hotel asset, and the Keefers' own appraiser, Marshall admits that the appraisal was not for a 4% interest in the entire Partnership because he excluded all other assets in the Partnership.  App. 400-401, Ex. 6, Marshall Dep., 124-125 ln 25-4; App. 413, Ex. 1 to Marshall Dep.  "That miscue goes to the essence of the information required, because without knowing the specific property contributed the Commissioner is unable to determine whether the contributed property interest was overvalued."  *See Est. of Evenchik*, 105 T.C.M. (CCH) 1231 (T.C. 2013).

As explained above in Section A, Marshall appraised something very different than a 4% partnership interest because there was a side oral agreement that completely changed the nature

of the gift and limited it to 4% of the net cash from the Closing Statement on the sale of the

hotel.  *See* App. 209, Ex. 15 to Keefer Dep.; App. 413, Ex. 1 to Marshall Dep.  The appraisal

does not define the excluded assets of the Partnership or their impact on the appraised value, and

Marshall admits that had he included the other assets of the Partnership, his appraisal conclusion

would have been different.  App. 401, Ex. 6, Marshall Dep., 125 ln 5-15.  The Keefers continue

with their argument, pointing to the understanding of the donated items among the Keefers and

Pi.  Here that is irrelevant because the description requirement is important, indeed essential, to

the review of charitable contribution deductions and the reliability of corresponding appraisals

by the IRS, not the taxpayer.  Furthermore, the Keefers' argument that any ambiguity as to the

asset being donated benefited the United States does not justify disregarding the description and

signature requirements that must be examined in determining whether the appraisal was a

qualified appraisal as defined under the Treasury Regulations.  The Keefers also do not cite

authority for their argument that the taxpayers understanding with the donee as to what is

donated is required for an appraisal to be qualified, nor do they cite Treasury Regulations that

evaluate the weight of taxpayer error in appraisals with respect to the descriptions of assets

alleged to have been donated.  Therefore, the Keefers' appraisal is not qualified as defined under

the Treasury Regulations because it did not adequately describe the donation of a 4% interest in a

partnership.

## 2.  The appraiser's Identifying Number is neither on the Form 8283 nor on the appraisal.

The Keefers' Response claims that the appraisal gave the identifying number of the

appraiser by attaching the appraisal to their Form 8283.  However, the identifying number of

David Marshall ("Marshall"), the appraiser, is not found on the Form 8283 nor within his

appraisal.  Marshall confirmed the same testifying that the only identifying number on the Form

8283 – reported as ending in "3011" – was not his Social Security Number.  App. 397, Marshall

Dep., 111-112 ln 13-22 (ECF 69-4).  He also testified that his appraisal lacked his identifying

number.  App. 379, Marshall Dep., 39 ln 1-15 (ECF 69-4).

The Keefers rely upon a definition of "person" pursuant to 26 U.S.C. §7701(a)(41) to

include an individual, trust, estate, partnership, association, company or corporation.  This

definition applies where not otherwise distinctly expressed.  *Id.*  They use this definition

attempting to cure their appraisal with the identifying number of the Katzen firm on the Form

8283 only. In sum, the Keefers Response attempts to confuse the Employer Identification

Number (EIN) of the firm that employed Marshall with the requirement that the appraisal list a

tax identification number for the licensed individual who conducted the appraisal – whether that

was the individual's Social Security Number or an EIN assigned to that individual because that

individual had employees of his own.

The IRC does however expressly provide a definition for a TIN and a person, when such

a definition is required by regulations prescribed by the Secretary.  It states, "The term "TIN"

means the identifying number assigned to a person under section 6109 [26 USCS § 6109]."  26

U.S.C.S. § 7701(a)(41).  Furthermore, Section 6109 states:

Identifying Numbers:

(d) Use of social security account number. The social security account number
issued to an individual for purposes of section 205(c)(2)(A) of the Social Security
Act [42 USCS § 405(c)(2)(A)] shall, except as shall otherwise be specified under
regulations of the Secretary, be used as the identifying number for such individual
for purposes of this title.

26 U.S.C.S. § 6109.  Therefore, attaching an appraisal that lacked the individual appraiser's

identifying number to a Form 8283 that lacked the individual appraiser's identifying number

does not and cannot cure the statutory requirement that the appraiser's identifying number be

included in the appraisal.

**3. The Keefers failed to provide the statutory-required document that they had relinquished exclusive legal control of their purported Pi donation**

In addition to the inadequate appraisal submitted for their alleged charitable contribution to their donor advised fund, the Keefers' contemporaneous written acknowledgment ("CWA") fails to comply with the statutory requirements for a charitable deduction.[4] Without a valid CWA, the Court can deny their deduction. *See Addis v. Comm'r.*, 374 F.3d 881, 887 (9th Cir. 2004) ("The deterrence value of section 170(f)(8)'s total denial of a deduction comports with the effective administration of a self-assessment and self-reporting system.").

To qualify for a charitable contribution exceeding $250, a taxpayer must obtain a CWA from the donee. 26 U.S.C. § 170(f)(8). But in 2006, Congress amended Section 170 by inserting the new requirement for contributions to donor advised funds such as Pi: "the taxpayer obtains a [CWA] . . . of such donor advised fund that such organization ***has exclusive legal control*** over the assets contributed." *Id.* § 170(f)(18) (emphasis added); *see also* H.R. Conf. Rep. 109-455 (2006), 182, 2006 U.S.C.C.A.N. 234, 372 (noting that contributions to donor advised funds must have "[i]n addition to satisfying present-law substantiation requirements under section 170(f), a donor must obtain . . . a [CWA] from the [donor advised fund] has exclusive legal control over the assets contributed").

The Keefers' claim for charitable contribution deduction fails because they did not provide a CWA that contains the "exclusive legal control" language. Donor advised funds, like Pi, must place the "exclusive legal control" language within the CWA. *See* § 170(f)(18). While

---

[4] The Keefers cannot invoke their substantial compliance and reasonable cause defenses to overcome a deficient CWA. *See Campbell v. Comm'r*, 119 T.C.M. (CCH) 1266, *9, *10 n.16 (T.C. 2020) ("we have held on numerous occasions that the doctrine of substantial compliance does not apply with respect to the CWA requirements"); ("[T]his reasonable cause exception does not apply to the requirement of sec. 170 and the regulations thereunder that the taxpayer obtain a CWA").

no court has addressed whether taxpayer can omit this statutory requirement, the general statutory purpose to even have such an acknowledgment is "to assist the Internal Revenue Service in processing tax returns on which charitable contribution deductions are claimed." *See 15 W. 17th St. LLC v. Comm'r*, 147 T.C. 557, 564 (2016) (citation omitted).

Moreover, while a court can consider several documents collectively to form a valid CWA, they must contain a merger clause. *See French v. Comm'r*, 111 T.C.M. (CCH) 1241 (T.C. 2016) (holding that multiple documents can form a CWA when "the deed contains a provision stating that the deed is the entire agreement of the parties"). Here, the Keefer Advisor Fund Documents include no mention that they constitute the entire agreement between the Keefers and Pi. App. 084-098, Exs. 11 and 12 to Keefer Dep. The lack of this merger clause is dispositive. Without this merger clause, the IRS must guess whether another document exists that could wrestle the purported "exclusive legal control" from Pi and transfer it to the Keefers. And that is precisely the case here. Keefer admits that his agreement with Pi was subject to a side oral agreement. *See* App. 030-031, Ex. 1, Keefer Dep. 119-124 ln 12-7. At least that is what Keefer says. However, Pi was unaware of the terms of that oral agreement. App. 464, Ex. 7, McCollough Dep., 53-54 ln 10-18. Clearly, there can be no meeting of the minds regarding "exlusive legal control" if one of the parties was unaware of the side oral agreement. Thus, the Keefers failed to provide a valid CWA.

The Keefers are therefore not entitled to a charitable contribution of $1,257,000, as they reported on their 2015 tax return, or a refund of income tax corresponding to this deduction, because their CWA does not meet the statutory requirements.

### 4. The Keefers are not entitled to a defense of substantial compliance to cure the defects in their appraisal because they did not act in good faith.

The Keefers state that the substantial compliance test applies to determining whether or not the Keefers' appraisal met the statutory requirements. "[S]ubstantial compliance is achieved where the [1] regulatory requirement at issue [2] is unclear [3] and a reasonable taxpayer acting in good faith and exercising due diligence nevertheless fails to meet it." *McAlpine v. Comm'r*, 968 F.2d 459, 462 (5th Cir. 1992).

As to the third element, the Keefers allege they acted in good faith. The Keefers failed to provide those tax advisors with all of the material and relevant facts. As such, the Keefers cannot claim that they acted in good faith. They did not inform their tax attorney, Horwitz, or their tax accountant, Weigand, that the Partnership had a side oral agreement that changed the nature of the donated asset to be valued in the appraisal. The Keefers' Response indicates that their tax attorney was aware of some type of cash reserves being held by the Partnership. When asked specifically when he became aware of the cash reserves, and if he could have become aware of the reserves after the inception of this litigation and his response was "Possibly." What is most significant though is that when questioned about the oral agreement referenced in the appraisal, he stated he did not recall being told about the oral agreement in 2015. The testimony surrounding his knowledge of the oral agreement is as follows:

> Q. So, again, my question to you is, Mr. Keefer testified about an oral agreement yesterday. Did he tell you in 2015 that there was such an oral agreement?
> A. I do not recall that at this time. No.
> Q. You testified about some reserves -- some cash reserves.
> A. You're fading. You're fading. I can't hear you.
> ….Q. I believe you were testifying about some reserves just a few minutes  ago. Those cash reserves that you were aware of, when did you become aware of those cash reserves?
> A. I don't recall.
> Q. Was it after this litigation was underway?
> A. Possibly.

16

Q.  Were you aware that Mr. Keefer did not discuss the oral agreement with    Mr. Weigand?

A.  No.

Q.  So does it remain your testimony that the oral agreement that's referenced in Mr. Marshall's appraisal was purported?

A.  I'm sorry?  I didn't understand your question.

Q.  Sure.  When we began your deposition, you testified several times and told me that the oral agreement that was referenced in Mr. Marshall's appraisal was purported.  Do you remember that?

A.  I do remember that.  Yes.

Q.  …  Oh, I know.  My question to you is, is it still your testimony, sitting here today, that the oral agreement referenced in David Marshall's appraisal was purported?

A.  Well, to the extent that I didn't have direct knowledge of it, I think the answer to that would have to be yes.

Q.  Sitting here today, can you explain why Mr. Keefer, your client, did not share information to you that there was an oral agreement in 2015?

A.  I was not involved in a lot of the details that were supplied to Mr. Marshall in connection with the appraisal.
A lot of conversations that -- transmittal of documents to support the appraisal went directly from either Mr. Keefer or Pat Sendy (phonetic) or somebody in his organization to Mr. Marshall.  And I just wasn't privy to it.  That wasn't what my function was.

Therefore, the Keefers' tax attorney confirmed that he did not have direct knowledge of the oral agreement referenced in the Keefers' appraisal.  Furthermore, the Keefers allege that CPA Weigand was aware of the oral agreement, without any supporting evidence.  His testimony confirms however that he was not aware of such an agreement.  App. 511-512, Ex. 8, Weigand Dep., 85-89 ln 9-18.  Therefore while the attorney and the CPA could have become aware of some type reserves, at an indefinite time in the past, the claim that they "were both aware of the disclosure," as to the oral agreement is false.  Response at 31 of 41.  Aside from the issues that this lack of disclosure raises with respect to the Keefers' reliance upon a reasonable cause defense, Keefer's failure to provide this information in the context of a good faith analysis demonstrates that Keefer did not act in good faith with respect to the preparation of their Appraisal.

17

Additionally, the Keefers' allege that the test is whether the Keefers reasonably relied upon the experts' advice in good faith, not whether the experts' advice was correct. Their reliance is not reasonable because they did not act in a reasonable manner. The Keefers did not provide all the material facts to their tax advisors so that they could receive expert advice.

In totality, therefore the Keefers have not met their burden to invoke substantial compliance because they proceeded in bad faith – not even providing information about their oral agreement and cash reserves to their tax advisors – and their appraisal did not allow the IRS to evaluate the value of the property that they allege they donated.

The Keefers further argue that the IRS should have afforded them an opportunity to add any omission to their appraisal, citing a committee history report from 1984 to support their position that Congress provided instructions to apply substantial compliance to determine the adequacy of appraisals. First, the report cited states that a taxpayer's deduction is not disallowed for a good faith failure to comply, and here the Keefers cannot make a showing of good faith. As discussed above, they failed to disclose to their tax attorney and their tax accountant the assets that they were proposing to donate. Second, as discussed in the United States' Motion for Summary Judgment (ECFs 67 and 68), the law surrounding the qualified appraisals has changed over time due to the various abuses noted by Congress, and the requirements surrounding appraisals have heightened over time. The Pension Protection Act of 2006 resulted in additional items that are now required to be included in an appraisal for it to meet the statutory requirements. As a result, since 1984, the requirements with respect to what makes a qualified appraisal have increased, and reference to a dated committee report is not persuasive because the law has changed, and the requirements have only heightened or increased since 1984.

**5.  The Keefers confuse the concept of admissibility with the *de novo* standard of review afforded tax refund suits.**

The Keefers argue that the government's view is that, in a tax refund case, a federal court is the wild, wild west and the government is not affected by the rules of evidence or procedure. Response at 37 of 41.  They do not understand the *de novo* standard of review afforded tax refund suits; and confuse the concept of admissibility of evidence with the *de novo* standard of review.  The admissibility of documents from the IRS' administrative record as evidence is a determination made at trial. Whether the IRS' document will be admitted at trial does not change the Keefers' burden in their tax refund suit.  The Keefers bear the burden of proof in a refund suit to prove the amount they are entitled to recover.  *Bombardier Aerospace Corp. v. United States*, 94 F. Supp. 3d 816, 840 (N.D. Tex. 2015), aff'd, 831 F.3d 268 (5th Cir. 2016).  Furthermore, the government's deficiency assessment is generally afforded a presumption of correctness.  *Id*. at 840.  The Plaintiffs have the burden of proving by a preponderance of the evidence that the Commissioner's assessment—its final determination of the taxpayer's liability—was erroneous, since the assessment is presumed to be correct.  *Id*. at 840, *citing Trinity Indus., Inc. v. United States*, 757 F.3d 400, 413 (5th Cir.2014).  Therefore, the Plaintiffs' must prove they are entitled to the tax refund they seek, proving by a preponderance of the evidence that the assessment was erroneous, no matter what grounds the IRS' prior audit or analyses determined were the reasons for the assessment.

The Keefers cite *Trinity Industries*, stating that only the IRS' conclusion is neither binding on the Government nor presumptively correct, but that evidence of the government's conduct is admissible for other purposes.   The Keefers do not explain, however, for what other purpose they seek to use the IRS' administrative record.  Finally, the only remaining case that they cite to support their allegations regarding the United States' views is a district court case

from Ohio,  which addresses the scope of discovery and not the applicability of the *de novo*

standard of reivew.  The case is not the controlling law and cannot change the Fifth Circuit's

rulings regarding the *de novo* standard of review afforded tax refunds suits.

**6.  The IRS's form instructions are not relevant to determining whether the Keefers complied with the Treasury Regulations.**

The United States does not argue that the Court should ignore Form 8283 instructions in

determining whether the Keefers are entitled to a charitable contribution deduction. The United

States, having previously briefed this issue, stated that form instructions do not serve as a a

substitute for Treasury Regulations.  The United States has proffered evidence to show that the

Keefers' appraisal is not a qualified appraisal according to the Treasury Regulations.  The form

instructions do not provide the requirements of a qualified appraisal.  The appraisal seeks to

value 4% of the net cash proceeds from the anticipated $54 million sale of the Partnership's hotel

asset.  The Form 8283 describes the purported donated asset to be different.  Additionally, the

Keefers' Form 8283 only includes the taxpayer identification number of Katzen, Marshall &

Associates, Inc. and not of the appraiser, Marshall.  The appraisal lacks both – neither Marshall's

taxpayer identification number nor Katzen, Marshall & Associates, Inc.'s taxpayer identification

number are listed in the appraisal.

**III.    The United States' Issue C:  The Keefers may or may not be Entitled to a Refund Attributable to the gain on the bargain sale.**

As part of its audit determination, the IRS assessed an additional tax for the bargain sale

portion of the donation of a 4% partnership interest.  The Keefer's paid that additional tax when

they paid the rest of the audit deficiency.  Based on Agent Dunford's computations completed as

the request of the undersigned counsel for the United States it is now clear that the gain on the

bargain sale will need to be reversed under all potential scenarios regardless of which party wins

Issues, A, B, C or D.  However as shown in Agent Dunford's computations the removal of the

gain on the bargain sale does not always equate to a tax refund for the Keefers.  This is the case in Scenario 2 where no refund is allowed because there is a larger adjustment in the other direction for anticipatory assignment of income.  App. 656.  This is also partially true for her Scenario 1 computation where the denial of the charitable donation and removal of the bargain sale gain results in a partial refund of $136,875.  App. 640.  The Keefers are barred from any relief under Scenario 3, but if the Court were to disagree, Agent Dunford's computation for Scenario 3 removes the gain on the bargain sale.  App. 673.  Finally, if the Keefers were to prevail on their claim for a charitable donation of a 4% partnership interest, the United States agrees that they computed the gain and corresponding tax on the bargain sale correctly and any IRS's adjustment to that gain should be reversed which would in turn generate the refund they have alleged they are entitled.

## IV.    The United States' Issue D:  The doctrine of variance bars any relief to the Keefers if they were to claim that they are entitled to a charitable contribution deduction for making a cash donation to Pi.

The Keefers are similarly not entitled to a charitable contribution deduction for their alternative claim in this suit that they donated $1,280,000 cash to Pi because they did not include that ground in their administrative claim for refund and it is now barred by the doctrine of variance.  26 C.F.R. § 301.6402–2(b)(1) (emphasis added) provides:

> The claim must set forth in detail ***each ground*** upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the ***exact basis*** thereof ... A claim which does not comply with this paragraph will not be considered for any purpose as a claim for refund or credit.

The Supreme Court, the Fifth Circuit and other courts agree that both the grounds and the amount of the refund sought must be stated.  *United States v. Felt & Tarrant Mfg. Co.*, 283 U.S. 269, 272, (1931) (The statute requiring a duly filed refund claim is not satisfied by the filing of a paper which gives no notice of the amount or nature of the claim for which the suit is brought).

*Alabama By-Prod. Corp. v. Patterson*, 258 F.2d 892, 900 (5th Cir. 1958) (All grounds upon which a taxpayer relies must be stated in the original claim for refund so as to apprise the Commissioner of what to look into; the Commissioner can take the claim at its face value and examine only those points to which his attention is necessarily directed). *United States ex rel. Endicott v. Mellon*, 39 F.2d 505 (D.C. Cir. 1930) (Claim for "$1 or such greater amount as is legally allowable" is inadequate).

Citing *El Paso CGP Co., L.L.C. v. United States,* 748 F.3d 225, 229 (5th Cir. 2014), the Keefers argue that there is an exception to the doctrine of variance. However, *El Paso* is distinguishable because there the IRS had made untimely assessments that it offset against the taxpayer's refund claim after the claim had been filed. The taxpayer filed a refund claim in 2002 for tax year 1986. *Id*. The IRS took action in 2005, refunding some of the taxpayer's overpayment, but not all because deficiencies in other years were offset against the amount due. *Id*. In response, the taxpayer brought suit to obtain the entire amount that it claimed in its 2002 refund claim. *Id*. The IRS argued that the district court had no jurisdiction to raise its claim because it had not previously been raised before the IRS. *Id*. Indeed, because the claim was filed in 2002, the taxpayer could not possibly have raised an issue that would arise from the IRS's conduct in 2005. The district court held that the variance doctrine stripped the court of jurisdiction to consider the claim. *Id. at 228*. The Fifth Circuit reversed that finding, holding that the district court had jurisdiction to consider the claim because "the variance doctrine [did] not bar this action when the only variance in [the taxpayer's] claim [arose] from alleged IRS failures to follow proper procedures of which [the taxpayer] was unaware when those failures occurred." *Id. at 229*. Later in distinguishing *El Paso*, a district court noted that the critical inquiry is whether the taxpayer could have asserted the ground for the claim or if government took

22

"unilateral action" that "itself create[d] the substantial variance." *See Bingham v. United States*, No. 1:03-CV-783, 2015 WL 3606239, at *6–7 (E.D. Tex. Apr. 23, 2015), aff'd sub nom. *Rodgers v. United States*, 843 F.3d 181 (5th Cir. 2016).

This case does not involve procedural defects in offsets being applied to the taxpayer's refund and the government unilaterally causing the substantial variance. Nor does it involve a government counterclaim for additional tax like that asserted in the *Shore*[5] case cited by *El Paso*. Such a counterclaim to collect additional tax would have given the Court jurisdiction to hear such an alternative argument by the Keefers. Instead, the United States has merely asserted the Keefers are not entitled to a refund for an alleged charitable contribution of an interest in their Partnership which was allegedly received by Pi, their donor advised fund, in the form of a cash payment after the Partnership had completed a previously arranged sale of its hotel. The Keefers were certainly aware of all of the details of their transactions with their Partnership, their transaction with Pi and the events leading up to those transactions – including their communications about trying to reduce anticipated taxes on income from the sale of a hotel that was virtually assured to happen. They were also aware of the side oral agreement and the language in the appraisal indicating that because of the side oral agreement, the item being valued for purposes of the donation was 4% of the net cash proceeds from the hotel sale Closing Statement. They also had access to cases like *Humacid* and *Hudspeth* where the potential for the transaction to be recast as an after-tax cash donation was explained. They had all of this factual and legal information well before they filed their administrative claim for refund. Nothing the government did prevented them from including an alternative argument in their administrative claim for a smaller refund based on a cash contribution to Pi. However, had the Keefers donated

---

[5] *Shore v. United States,* 26 Cl. Ct. 826, 828-29 (1992).

cash, they would have also been required to recognize full gain on the sale of their entire interest in the Partnership's hotel. The Keefers specifically did not do so because as Mr. Keefer testified, one of the goals was the reduce his anticipated tax liability on the sale of the hotel, while also obtaining the benefit of a charitable contribution deduction. In other words, they knew that if they were not successful their alleged donation of a partnership interest, they would be taxed on the entire gain on the sale of the Partnership's hotel, but they could still claim a charitable deduction for cash they received and paid income tax on.

The court in *El Paso* also cited *Brown v. United States*, 427 F.2d 57 (9th Cir. 1970). However, *Brown* is also distinguishable because, as at least one other court has held, the exception to the doctrine of variance does not apply if the government's position in litigation was predictable. In *Bessemer City Bd. of Educ. v. United States*, 576 F. Supp. 2d 1249, 1257–58 (N.D. Ala. 2008), the court refused to follow *Brown* because the taxpayer's new arguments were effectively the opposite of the taxpayer's own arguments, were not surprises and did not prevent the taxpayers raising its alternative claims earlier. Nothing the government has done in this case prevented the taxpayers from raising this alternative ground for relief at the administrative level. Furthermore, even if the doctrine of variance does not apply, the Keefers' transfer of net cash of $1,277,000 to their Keefer Donor Advised Fund with Pi does not entitle them to a deduction for a cash contribution under Section 170 because they do not have a contemporaneous written acknowledgement describing the property that they donated was cash, and without specifying the amount. A CWA is required whether the purported donation was one of cash or non-cash property. 26 U.S.C. § 170(f)(8)(B)(i). The Keefers have not provided a CWA for either a partnership interest or a cash donation. Therefore, the Keefers cannot now claim that they are entitled to a refund based on a cash charitable deduction of $1,277,000, because (1) they do not

24

have a CWA as required by statute and (2) any such argument they might now raise is jurisdictionally barred by the doctrine of variance.

## V.    CONCLUSION

The Keefers' refund must be denied because it relies on two inconsistent positions. They allege that they donated a 4% interest in the Partnership, however their appraisal appraises a different asset – 4% of the net cash from the sale of the Partnership's only operating asset. The appraisal also lacks the appraiser's Social Security Number or an EIN assigned to that appraiser. The Keefers are not entitled to a defense of substantial compliance or reasonable cause because they failed to inform their tax advisors of the oral agreement which completely changed the asset that was being appraised. Finally, the Keefers are not entitled to now claim that they are entitled to a charitable contribution of cash based on the doctrine of variance.

Dated:  December 21, 2021

DAVID A. HUBBERT
Deputy Assistant Attorney General

Moha P. Yepuri
Texas State Bar No. 24046651
Christian A. Orozco
Texas State Bar No. 24107886
U.S. DEPARTMENT OF JUSTICE - TAX DIVISION
717 N. Harwood St., Suite 400
Dallas, Texas 75201
(214) 880-9767/(214) 880-9757
(214) 880-9741 (Facsimile)
Moha.P.Yepuri@usdoj.gov
Christian.A.Orozco@usdoj.gov

ATTORNEYS FOR UNITED STATES

25

## CERTIFICATE OF SERVICE

I certify that on December 21, 2021, a copy of the forgoing was electronically filed on the

CM/ECF system, which will automatically service a Notice of Electronic Filing on the following

attorney in charge for Plaintiffs:

GLAST, PHILLIPS & MURRAY, P.C.
Kenneth M. Horwitz
kmh@gpm-law.com
Richard E. Young
ryoung@gpm-law.com
14801 Quorum Drive, Suite 500
Dallas, Texas 75254

*/s/  Moha P. Yepuri*
Moha P. Yepuri
Trial Attorney, Tax Division