UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

KEVIN M. KEEFER and PATRICIA § 
KEEFER, §
 §
   Plaintiffs, §
 §
v. §   CIVIL ACTION NO. 3:20-CV-0836-B
 §
UNITED STATES OF AMERICA, §
 §
   Defendant. §

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiffs Kevin M. Keefer ("Kevin") and Patricia S. Keefer (collectively, "the Keefers")'s Amended Motion for Summary Judgment (Doc. 64), and Defendant the United States of America ("the Government")'s Amended Motion for Summary Judgment (Doc. 67). For the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** the Keefers' motion, and **GRANTS IN PART AND DENIES IN PART** the Government's motion.

## I.

## BACKGROUND

This is a tax-refund case. The Keefers are a married couple who seek a refund of income tax they jointly paid for 2015. Doc. 15, Am. Compl., ¶¶ 1, 3. The alleged overpayment resulted when the IRS disallowed the Keefers' charitable deduction for a donation of a 4% interest in "Burbank HHG Hotel, LP, [('Burbank')] a . . . limited partnership, to the Pi Foundation [('Pi')], a . . . non-profit corporation." *Id.* ¶¶ 7, 10.

A.    *The Donation to Pi*

In 2015, when the events giving rise to this suit occurred, Burbank was a limited partnership existing for the purpose of owning and operating a single hotel property ("the Hotel"). *See* Doc. 66, Appraisal, 50, 54. Kevin was a limited partner in Burbank. Doc. 15, Am. Compl., ¶ 7; Doc. 69-5, Assignment Int., 19.

On April 23, 2015, Burbank and Apple Hospitality REIT ("Apple"), exchanged a nonbinding letter of intent ("LOI") for a deal that included Apple's purchase of the Hotel.[1] Doc. 66, Appraisal, 54; *see* Doc. 69-1, Keefer Dep., 11, 47. Burbank did not sign the LOI but continued negotiating for the Hotel's sale. Doc. 66, Appraisal, 54. Burbank was also considering other offers for the Hotel. *Id.* at 54–55; *see* Doc. 69-1, Keefer Dep., 11, 47. On June 18, 2015, Kevin assigned a 4% limited partner interest in Burbank to Pi for the purpose of establishing a donor advised fund ("DAF") at Pi. Doc. 69-5, Assignment Int., 19–20. As of that date, "[Burbank] had tentatively agreed on the sale of [the Hotel to Apple] for $54 million, but the contract for sale had not been signed and Apple had not conducted its review of the property and records." Doc. 66, Appraisal, 54; *see* Doc. 69-1, Keefer Dep., 11. On July 2, 2015, Burbank and Apple signed a contract for Apple to purchase the Hotel for $54 million. Doc. 69-4, Purchase Contract, 48–55; Doc. 69-5, Purchase Contract, 1; Doc. 66, Appraisal, 54. The contract provided for a 30-day review period for [Apple] to evaluate the property. Doc. 69-4, Purchase Contract, 54. The sale closed on August 11, 2015. Doc. 69-5, Closing Statement, 7–8.

---

[1] When citing to Doc. 69 and its attachments (Government's Appendix) the Court refers to the page numbers generated by the Court's Electronic Filing System.

B.     *The Appraisal*

To substantiate the donation, the Keefers' tax advisor commissioned an appraisal of the donated partnership interest as of June 18, 2015 ("the Appraisal"). *See* Doc. 66, Appraisal, 50–56. The Appraisal was performed by Katzen, Marshall & Associates, Inc. ("KM") and was prepared and signed by David Marshall ("Marshall"), a Principal of that firm. *Id.* at 56, 60. It included an appraiser's certification and a description of Marshall's qualifications but did not include either Marshall's or KM's tax identification numbers. *See id.* at 58–61. Additionally, the Appraisal included a section titled "Partnership Agreement," setting out "[c]ertain provisions of the [Burbank Partnership] Agreement[,]" including that agreement's definition of "Available Cash Flow" and the schedule for "Distribution of Available Cash Flow." *Id.* at 52–53.

The Appraisal indicated that its "purpose [was] estimating the fair market value of a 4.000% limited partnership interest, subject to an oral agreement, . . . in Burbank . . . , owned by Kevin." *Id.* at 50. Attached to the Appraisal was a "STATEMENT OF LIMITING CONDITIONS" describing the referenced oral agreement as follows:

> [KM] ha[s] been informed that the Donor and Donee have an agreement that the Donee will only share in the next proceeds from the Seller's Closing Statement. The Donee will not share in Other Assets of the Partnership not covered in the sale.

*Id.* at 57.

After describing its method for calculating the donated asset's value, the Appraisal concluded that $1,257,000 "reasonably represent[ed] the fair market value, excluding Other Assets of the Partnership, of a 4.000% Limited Partnership Interest in Burbank . . . as of June 18, 2015," with "[a]ll estimates of value . . . subject to the attached Statement of Limiting Conditions and Appraisers' Certification." *Id.* at 56. The Appraisal indicated that "[Kevin] stated that at the Valuation Date,

he was not aware of any material fact or condition that would . . . derail the sale . . . [and that] the Partnership had a second bidder at essentially the same price." *Id.* at 55. The Appraisal estimated a "5% probability of no sale." *Id.*

C.     *Pi's Acknowledgment of the Donation*

On June 5, 2015, Pi sent Kevin a twelve-page packet of materials provided by Pi related to establishment of the "Keefer Donor Advised Fund" ("the DAF Packet"). Doc. 66, DAF Packet, 38–49. Kevin signed the DAF Packet on June 8, 2015. *Id.* The DAF Packet stated that "Kevin . . . hereby transfers as an irrevocable gift to [Pi] . . . the property described in Schedule A attached here to and incorporated as part of this Document." *Id.* at 38. Schedule A described the property as "4.00% of Interest in [Burbank]." *Id.* at 40. Schedules B, C, and E, also included in the DAF Packet, provided additional details including the following provisions that the Keefers claim acknowledge Pi's exclusive legal control over the donated interest:

> Schedule B . . . "THE PI FUND PROCEDURES FOR OPERATION OF DONOR ADVISED FUNDS"
>
> 1.1 <u>Authorization</u>. . . . The Board of Directors of [Pi] has authorized the adoption of these procedures for the establishment and administration of DAF. These procedures may be amended from time to time, when deemed necessary or desirable by the Board of Directors.
>
> 1.2 <u>Establishment of Funds</u>. . . . DAF are and shall be administered as part of the endowment funds of [Pi].
>
> 1.3 <u>Nature and Terms of Funds</u>. Each DAF shall be held by [Pi]. The Distribution Committee of [Pi] or the Board of Directors of [Pi]. . . shall have the ultimate authority and control of all assets in the DAF, and the income derived therefrom, for the charitable purposes of [Pi].
>
> 2.1 <u>Authorization</u>. . . . A Donor may not impose any material restriction or condition that prevents [Pi] from freely and effectively employing the contributed assets, or the income derived therefrom, in furtherance of a charitable purpose of [Pi].

3.1 <u>In General</u>. The Distribution Committee has the right to direct all distributions of income or principal of DAFs. The donor of a DAF account . . . may . . . recommend to [Pi] the making of distributions from the Fund which are consistent with the charitable objectives of [Pi]. . . but such recommendations will be solely advisory and [Pi] is not bound by such recommendations.

3.5.2 <u>Staff Investigation</u>. With respect to each recommendation by a Donor, [Pi] will make an investigation to determine whether the recommendation is consistent with the charitable mission of [Pi]. . . . If [Pi] determines that the recommendation is not consistent with the charitable mission of [Pi], the Donor shall be advised that the recommendation does not meet the standards for distributions.

3.5.3 <u>Distribution Committee Action</u>. The Distribution Committee shall act upon all recommendations by Donors and shall allocate funds from DAFs in accordance with regular Distribution Committee grantmaking procedures.

Schedule C . . . "HOW TO OPERATE YOUR [DAF]"

<u>OWNERSHIP AND CONTROL</u>
Donor-advised funds will be the exclusive property of The Pi Fund . . . . They will be administered under and subject to the bylaws and procedures of The Pi Fund including any amendments. All donor-advised funds are subject to variance power which gives The Pi Fund the ability to redirect funds should the cause for which they were established become obsolete.
. . .
<u>GRANTMAKING</u>

Donors have the privilege of making non-binding recommendations as to the timing, amount and charitable recipient of distributions. The Pi Fund retains the legal right to direct grants. . . . The Pi Fund, as required by law, retains authority over the use and distributions of the fund. . . .
. . .
<u>Approval process</u>: [R]ecommendation[s] will be evaluated . . . and presented to the Board. . . . Should the Board not approve the grant, the donor will be notified immediately.
. . .
<u>Management</u>: . . . The Pi Fund retains control of investments, including control of the retention or sale of any assets contributed. . . .

Schedule E . . . "FEE SCHEDULE"

The Foundation may elect, in its sole discretion, whether and how to invest the proceeds of a donor's account. The Foundation retains the exclusive right to manage and invest the assets in any account as the Board determines from time to time.

*Id.* at 41–49; *see* Doc. 65, Pls.' Br. Am. Mot., 17–19 (listing relevant provisions).

On or around September 9, 2015,[2] Kevin received a letter from Pi acknowledging the donation ("the Acknowledgment Letter"). Doc. 69-1, Acknowledgment Letter, 98; Doc. 69-1, Keefer Dep., 36. The body of this letter read in full:

> Thank you for your donation to The Pi Foundation, Inc. of a 4.00% interest in Burbank HHG Hotel, LP. The Pi Foundation, Inc., is a 501(c)(3) nonprofit organization. Your contribution is tax-deductible to the extent allowed by law. No goods or services were provided in exchange for your generous financial donation. Please keep this page for your records.

69-1, Acknowledgment Letter, 98.

D.    *The Keefers' 2015 Tax Return and 2019 Notice of Deficiency*

In October 2016, the Keefers "timely filed their joint federal income tax return (Form 1040) for the year 2015." Doc. 15, Am. Compl., ¶ 9. "[They] deducted the Pi charitable contribution of $1,257,000 from income in their 2015 return on Schedule A." *Id.* Attached to the Form 1040 was Form 8283, signed by Marshall and listing KM's tax identification number. *See* Doc. 66, Claim for

---

[2] The Keefers' Brief in Support of their Amended Motion for Summary Judgment states that they received a one-page acknowledgment letter from Pi on "June 6, 2015." Doc. 65, Pls.' Br. Am. Mot., 16; *see* Doc. 66, June 6 Acknowledgment Letter, 97. Aside from the date, this June 6, 2015 acknowledgment letter is identical to the September 9, 2015 Acknowledgment Letter also present in the record. *See* Doc. 69-1, Acknowledgment Letter, 98; Doc. 69-1, Keefer Dep., 38. Because Kevin testified that the Keefers received only two documents from Pi acknowledging the donation, *see* Doc. 69-1, Keefer Dep., 38, and yet the record includes two otherwise-identical acknowledgment letters—one dated June 6, 2015, Doc. 66, June 6 Acknowledgment Letter, 97, and one dated September 9, 2015, Doc. 69-1, Acknowledgment Letter, 98—in addition to the DAF Packet, the Court recognizes that a fact question may exist about when Pi provided the acknowledgment letter or if Pi provided two acknowledgment letters (making a total of three documents, together with the DAF Packet).

However, for the reasons discussed *infra* Section III(D)(1), the existence of a June 6, 2015 Acknowledgment Letter would not impact the Court's resolution of the Keefers' claim. Therefore, the Court treats any of the Keefers' references to or arguments regarding an Acknowledgment Letter dated June 6, 2015 as applying to the same letter dated September 9, 2015—the interpretation most favorable to the Keefers. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587. And regardless, the Court does not find that any genuine issue of material fact exists based on the date of the acknowledgment letter, because neither acknowledgment letter—however dated—satisfies the requirements of 26 I.R.C. § 170(f)(18). *See infra* Section III(D)(2) and (3).

Refund, 29, 31; Doc. 66, Form 8283, 36. Also attached were the Appraisal, the DAF Packet, and the Acknowledgment Letter. *See* Doc. 66, Claim for Refund, 29, 31; Doc. 66, IRS Checklist, 66–71.

In late July or early August of 2019 "the IRS sent plaintiffs [an examination report and] a Notice of Deficiency for the year 2015 [(collectively, 'the IRS Notice')] . . . disallow[ing the] 2015 charitable contribution to Pi, and thereby increas[ing] plaintiffs' 2015 tax by $423,304.00, along with penalties or additions of $84,660.80 plus accruing interest." Doc. 15, Am. Compl., ¶ 10; Doc. 66, IRS Notice, 4–22. The IRS Notice stated in relevant part:

> It has not been established that the Taxpayers are entitled to deduct a charitable contribution in the amount of $1,257,000, [because] they did not have [a contemporaneous written acknowledgment ("CWA")] from the donee organization showing that the donor advised fund "has exclusive legal control over the assets contributed" and their appraisal did not include the identifying number of the appraiser. Therefore, this deduction is not allowable.

*Id.* at 7.

"[The Keefers] disagreed with the IRS Notice, but in October 2019, . . . paid [the $507,964.80 total in] additional taxes and other charges." Doc. 15, Am. Comp., ¶ 10; Doc. 66, Payment, 23. In November 2019 they filed for a refund of all or part of the $507,964.80, arguing that the 2015 Return and its attachments satisfied the CWA and appraisal requirements and alternatively that the deficiency and penalties were wrongly calculated. Doc. 15, Am. Comp., ¶ 11.

In March 2020, the IRS disallowed their claim for refund as untimely filed. Doc. 66, Refund Denial, 80–83. This suit followed.

The Keefers filed the instant motion seeking summary judgment that "[t]he IRS erred . . . in denying the Keefers' deduction and refund request on the bases the IRS used" and that they are entitled to a refund of the full $507,964.80. Doc. 64, Pls.' Am. Mot., 1. Alternatively, they seek smaller refund amounts based on alternative tax scenarios dependent on the Court's resolution of

issues raised in this litigation by the IRS. *Id.* at 1–2. The Government also moves for summary judgment, claiming that the defense of variance bars the Keefers' alternative claims and that the Keefers are not entitled to any refund. Doc. 67, Gov't's Am. Mot., 1–2. The motions are fully briefed and ripe for review. The Court considers them below.

## II.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he substantive law . . . identif[ies] which facts are material," and only a "dispute[] over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the facts and the inferences drawn from the facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

Once the summary-judgment movant has met its burden, "the non[-]movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (citation omitted). A non-movant may not simply rely on the Court to "sift through the record" to find a fact issue, but must point to specific evidence in the record and articulate precisely how that evidence supports the challenged claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Moreover, the evidence the non-movant provides must raise "more than . . . some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. The evidence must be such that a jury could reasonably find in

the non-movant's favor. *Anderson*, 477 U.S. at 248. If the non-movant is unable to make such a showing, the court must grant summary judgment. *Little*, 37 F.3d at 1075.

## III.

## ANALYSIS

The Keefers move for summary judgment on four claims:

Claim 1: "The IRS erred . . . in denying the Keefers' deduction and refund request on the bases the IRS used." Doc. 64, Pls.' Am. Mot., 1.

Alternative Claim 2: "Alternatively, if the Court finds the contribution was really an anticipatory assignment of income, the Keefers are entitled to the tax refund of the amount shown by the U.S.'s calculation, plus a refund of the resultant overpaid penalties and interest." *Id.*

Alternative Claim 3: "Also alternatively, if the Court finds the Keefers' deduction should be disallowed, an order requiring the IRS to recalculate [the] Keefers' basis in the contributed asset, and award[ing] a refund of resultant overpaid taxes, penalties and interest." *Id.*

Claim 4: "[S]ummary judgment denying the . . . defense of variance to the Keefers' two alternative claims." *Id.*

The Government asserts that the defense of variance bars the Keefers' Alternative Claims 2 and 3 and moves for summary judgment that the variance defense applies and the Keefers are not entitled to any refund. Doc. 67, Gov't's Am. Mot., 1–2.

The Court has considered the merits of each motion independently but addresses them together and as follows. First, the Court addresses the Government's argument that this Court lacks jurisdiction to decide the Keefers' Alternative Claims 2 and 3 because the doctrine of variance, as codified by IRS Regulation, bars their assertion. Second, the Court takes up the issue of whether the

donation was an anticipatory assignment of income, concluding that it was. Third, and independent of the anticipatory assignment of income analysis, the Court finds that the IRS properly rejected the charitable contribution deduction for the partnership interest donation because the Keefers did not obtain a statutorily compliant CWA. Finally, having determined that the anticipatory assignment of income doctrine applies and, independently, that the charitable deduction was properly denied, the Court finds that the Keefers are not entitled to a refund of tax paid for 2015.

A.     *The Keefers' Claim for Refund Was Timely*

As a threshold matter, the Court finds that the IRS erred in denying the Keefers' claim for refund as untimely. The Tax Code provides that a "[c]laim for credit or refund of an overpayment . . . shall be filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later." 26 U.S.C. § 6511(a). The Fifth Circuit has stated that "the plain meaning of 'tax was paid' in § 6511(a) is that money was transferred to satisfy a tax liability." *Schaeffler v. United States*, 889 F.3d 238, 247 (5th Cir. 2018). Therefore, there is no genuine issue of material fact that the Keefers' claim for refund was timely made on November 7, 2019, within two years from the time they transferred $507,964.80 to the IRS in October 2019 for the assessed deficiency. *See* Doc. 66, Payment, 23; Doc. 66, Refund Denial, 80–83.

B.     *The Doctrine of Variance Does Not Bar the Keefers' Alternative Claims*

Next, the Court finds that it has jurisdiction to decide the Keefers' Alternative Claims 2 and 3.

"Suits for tax refunds are governed by I.R.C. § 7422(a), which requires that a claim for refund comply with 'the regulations of the Secretary established in pursuance thereof.'" *See El Paso CGP Co.*

*v. United States*, 748 F.3d 225, 228 (5th Cir. 2014). Here, "[t]he relevant regulation requires that a claim for refund 'set forth in detail each ground upon which a . . . refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof . . . .'" *Id.* (quoting 26 C.F.R. § 301.6402-2(b)(1)) (second alteration in original). "This regulation codifies the variance doctrine[,]" which establishes that "a taxpayer is barred from raising in a refund suit grounds for recovery which had not previously been set forth in its claim for a refund." *Id.* (quoting *Mallette Bros. Constr. Co., Inc. v. United States*, 695 F.2d 145, 155 (5th Cir. 1983)). "All grounds upon which a taxpayer relies must be stated in the original claim for refund . . . . Anything not raised at that time cannot be raised later in a suit for refund." *Id.* at 229 (alteration in original) (quoting *Ala. By–Prods. Corp. v. Patterson*, 258 F.2d 892, 900 (5th Cir. 1958)). The effect of this doctrine is to deprive the court of jurisdiction over a refund claim that is based "on . . . grounds that were not raised before the IRS." *See id.*

However, "courts have explicitly carved out an exception in cases where the Government's unilateral action itself creates the substantial variance." *Id.* (first citing *Shore v. United States*, 26 Ct. Cl. 826, 828–29 (1992); and then citing *Brown v. United States*, 427 F.2d 57, 62 (9th Cir. 1970)). When "the Government raises new defenses or counterclaims for the first time after the claim is in litigation," this exception "allow[s] the taxpayer flexibility to respond." *Id.* In such circumstances, the Government is deemed to have waived the regulation. *See Brown*, 427 F.2d at 62. In sum, "the Government cannot use the variance doctrine to straightjacket the taxpayer when the Government unexpectedly changes its litigation strategy." *El Paso CGP Co.*, 748 F.3d at 229; *see also Brown*, 427 F.2d at 62 ("It would be unfair to allow the Government to assert a new defense to a taxpayer's claim . . . and simultaneously to prevent the taxpayer from making appropriate responses to it, because the

taxpayer had not previously anticipated the defense. The administration of the revenue system would not be enhanced by encouraging taxpayers to bal[l]oon their refund claims in attempts to anticipate every conceivable Government defense.").

Here, the Keefers assert that in February 2021—during litigation of this suit—the Government first raised the anticipatory assignment of income doctrine. Doc. 65, Pls.' Br. Am. Mot., 26; Doc. 71, Pls.' Resp., 33. In October 2021 the Government produced the calculations of potential alternative tax refunds that might be due to the Keefers depending on how this Court decided the anticipatory assignment of income and charitable donation disallowance issues, on which the Keefers' Alternative Claims 2 and 3 are based. Doc. 65, Pls.' Br. Am. Mot., 26; Doc. 71, Pls.' Resp., 33. The Keefers further argue that they "'cannot be foreclosed from responding' to new issues created by the Government after the filing of the initial refund claim," Doc. 65, Pls.' Br. Am. Mot., 26, and that the exception articulated in *El Paso CGP Co.* applies in this case. Doc. 71, Pls.' Resp., 33 (citing *El Paso CGP Co.*, 748 F.3d at 229).

The Government responds that the unilateral action exception does not apply because the Government has not created the variance by procedural defect and the Keefers "had access" to cases explaining "the potential for the transaction to be recast as an after-tax cash donation" under the anticipatory assignment of income doctrine. Doc. 73, Gov't's Reply, 23. Because "[n]othing the [G]overnment did prevented them from including an alternative argument in their administrative claim for a smaller refund based on a cash contribution to Pi," the Keefers' actions—not the Government's—have created the variance, the Government argues. *Id.*

The Court finds that it has jurisdiction to consider the Keefers' Alternative Claims 2 and 3. *See El Paso CGP Co.*, 748 F.3d at 229. The evidence shows that here, as in other cases where courts

have applied an exception to the variance doctrine, "the Government raise[d] [a] new defense[] . . . for the first time after the claim [was] in litigation" by first asserting the applicability of the anticipatory assignment of revenue doctrine in February 2021. *See* Doc. 66, IRS Notice, 5–8 (not raising anticipatory assignment of income); Doc. 19, Answer (not raising anticipatory assignment of income); Doc. 28, Br. Mot. Ex. Time, 2, 4 (raising anticipatory assignment of income and asserting that the Government was "developing" that defense); *see Brown*, 427 F.2d at 62. Though prior cases have held that the anticipatory assignment doctrine might apply to a donation like this one, the Court agrees that a taxpayer is not required to "bal[l]oon their refund claims in attempts to anticipate every conceivable Government defense" or risk losing the ability to respond to a newly-asserted Government defense. *Brown*, 427 F.2d at 62; *see also El Paso* CGP Co., 748 F.3d at 229 (citing *Brown*). Therefore, the Court finds that the doctrine of variance does not bar the Court's consideration of the Keefers' two alternative refund claims.

The Court thus proceeds to determine the two independent issues on which resolution of the Keefers' Claim 1, Alternative Claim 2, and Alternative Claim 3 depend: (1) whether the donation was an anticipatory assignment of income and (2) whether the charitable donation deduction was properly denied.

C.    *The Donation Was an Anticipatory Assignment of Income*

"The assignment of income doctrine holds that one who earns income cannot escape tax upon the income by assigning it to another." *Caruth Corp. v. United States*, 865 F.2d 644, 648 (5th Cir. 1989). Instead, "if one, entitled to receive [income] at a future date . . . makes a grant of it by anticipatory assignment, he realizes taxable income as if he had collected [it] . . . and then paid it over." *Id.* (quoting *Comm'r v. P.G. Lake, Inc.*, 356 U.S. 260, 267 (1958)). "Ultimately, the question

is whether the taxpayer himself ever earned income, or whether it was earned instead by the assignee," or, in the terms of Justice Holmes's famous metaphor for this doctrine (set out in *Lucas v. Earl*, 281 U.S. 111, 115 (1930)), "whether the fruit has been attributed to a different tree, or whether instead the entire tree has been transplanted." *Id.* at 649.

Applied to a taxpayer's gift of "earnings derived from an income-producing asset, the crucial question is whether the asset itself, or merely the income from it, has been transferred." *Id.* at 648. "If the taxpayer gives away the entire asset, with accrued earnings, the assignment of income doctrine does not apply." *Id.* at 648–49 (first citing *Blair v. Comm'r*, 300 U.S. 5, 14 (1937); and then citing *United States v. Ga. R.R. & Banking Co.*, 348 F.2d 278, 285 (5th Cir. 1965)). But, it does apply "[i]f the taxpayer carves income or a partial interest out of the [granted] asset, and retains something for himself." *Id.* at 649 (quoting *P & G Lake*, 356 U.S. at 265 & n. 5).

"Per *Humacid Co. v. Commissioner*, 42 T.C. 894, 913 (1964), [courts will] respect the form of [a donation of appreciated stock shares] if the donor (1) gives the property away absolutely and parts with title thereto (2) before the property gives rise to income by way of a sale." *Dickinson v. Comm'r*, 2020 WL 5249242, at *3 (T.C. Sept. 3, 2020) (first citing *Grove v. Comm'r*, 490 F.2d 241, 246 (2d Cir. 1973); then citing *Carrington v. Comm'r*, 476 F.2d 704, 708 (5th Cir. 1973); then citing *Behrend v. United States*, 1972 WL 2627, at *3 (4th Cir. 1972); and then citing *Rauenhorst v. Comm'r*, 119 T.C. 157, 162–163 (2002)).

The Keefers argue that the assignment here satisfies both these *Humacid* prongs[3] because there was some uncertainty that the Hotel's sale to Apple would occur, Doc. 71, Pls.' Resp., 8–10;

---

[3] The parties agree that the Court should apply the *Humacid* analysis to this partnership interest donation, *see* Doc. 68, Gov't's Br., 16–17; Doc. 71, Pls.' Resp., 8–14, and the Court is aware of no authority to the contrary. Accordingly, the Court applies the *Humacid* analysis.

and because Kevin assigned to Pi a 4% partnership interest including "all rights and interests pertaining" to that interest. *Id.* at 13–14. The Government urges the Court to find that the anticipatory assignment doctrine applies because the Hotel sale was "practically certain" by the time Kevin assigned the partnership interest to Pi, Doc. 68, Gov't's Br., 16–17, and the Keefers carved out and retained a portion of the partnership asset by oral agreement. *Id.* at 17.

Below, the Court first addresses the second *Humacid* prong and then turns to the first *Humacid* prong.[4]

### 1.    The Assignment Was Executed Before the Keefers' Right to Income Vested

Generally, analysis of the second *Humacid* prong focuses on whether a legal right to income from redemption of the appreciated stock vested before the donor transferred ownership and control of the asset. *C.f. Rauenhorst*, 119 T.C. at 163–64 (citing *Harrison v. Schaffner*, 312 U.S. 579, 582 (1941)) (explaining that the question is whether the "right to receive income has vested" before the assignment); *Caruth Corp.*, 865 F.2d at 649 (considering whether the assignor had any legal right to a later-declared dividend before he assigned the stock shares to the assignee who received the dividend).

In a few cases, courts have extended this doctrine to situations where the stock's redemption was so imminent and certain that "the shareholder's corresponding right to income had already crystallized at the time of the gift." *Dickinson*, 2020 WL 5249242, at *3 (emphasis omitted) (citing *Palmer v. Comm'r*, 62 T.C. 684, 694–95 (1974)); *see Ferguson v. Comm'r*, 174 F.3d 997, 1001–02 (9th Cir. 1999). These courts have generally drawn the line where the corporation's shareholders or directors have already voted to redeem shares, creating a "binding obligation" of redemption. *See*

---

[4] The Court addresses the *Humacid* prongs in this order because it must determine *when* the right to income vested to consider whether the entire interest was transferred before that date.

*Dickinson*, 2020 WL 5249242 at *3. But the Ninth Circuit has extended this principle to situations where, considering the facts and circumstances of a particular deal, redemption is "practically certain to proceed" without a binding obligation. *See id.* at *3 n.2 (quoting *Ferguson*, 174 F.3d at 1004).

The Government urges this Court to follow the Ninth Circuit's more expansive approach, as set out in *Ferguson*, in applying *Humacid* to this limited partnership interest. Doc. 68, Gov't's Br., 17. In *Ferguson*, a taxpayer donated shares of appreciated stock during an open tender offer window preceding a proposed merger. 174 F.3d at 998–1000. "[T]he tender offer, and hence the merger agreement, was conditioned on the . . . [tender] of at least 85% of the outstanding shares . . . by the expiration date of the tender offer . . . . However, this minimum tender condition was waivable at the sole discretion of [the acquiring company]." *Id.* at 999. As of the date the taxpayer assigned the shares, with "over one week remaining in the tender offer window," "over 50% of the outstanding . . . shares had been tendered, . . . [which the Tax Court found] was sufficient to ensure that [the acquiring company] would accept the tendered stock and thus unilaterally could and would proceed with the merger." *Id.* at 1004. The Tax Court therefore found this was an anticipatory assignment of the redemption income. *Id.* The Ninth Circuit affirmed the Tax Court's ruling that the anticipatory assignment doctrine applied, finding that the acquiring company's duty to consummate the merger had *not* been triggered as of the assignment date because the 85% tender threshold had not yet been satisfied, but that given the "momentum" of the deal and the interests of all the parties the merger was "most unlikely" to fail. *Id.* at 1005–1006.

The Court declines to extend the *Ferguson* approach to the real estate transaction at issue here. The uncontroverted evidence shows that the Keefers executed the agreement to assign the partnership interest to Pi on June 18, 2015. Doc. 69-5, Assignment Int., 19–20. The partnership

executed the contract for sale of the Hotel on July 2, 2015. Doc. 69-4, Purchase Contract, 48–55; Doc. 69-5, Purchase Contract, 1–2. So, at the time of the assignment on June 18, 2015, the Hotel was not even under contract. And while Apple had sent an LOI to Burbank before that date, the LOI was nonbinding and was never signed by Burbank. Doc. 66, Appraisal, 54; *see* Doc. 69-1, Keefer Dep., 11; Doc. 69-1, LOI, 47–49. Moreover, even after the contract with Apple was signed, it provided Apple a 30-day review period. Doc. 69-4, Purchase Contract, 54. Until that review period elapsed, Apple had no binding obligation to close and the deal was not "practically certain" to go through. *See id.*

Under these circumstances, the Partnership's right to the income from the Hotel sale had not yet vested when the Keefers assigned the interest to Pi. Thus, the pending sale—even if very likely to occur considering the presence of backup offers and as reflected in the appraiser's estimate that the risk of no sale was only 5%—does not render this donation an anticipatory assignment of income. *See* Doc. 66, Appraisal, 55; *cf. Caruth Corp.*, 865 F.2d at 649 ("The IRS . . . makes recourse to Justice Holmes['s] metaphor, and urges that we hold Caruth taxable upon the dividend because here the fruit was exceptionally ripe . . . . We fail to see why the ripeness of the fruit matters, so long as the entire tree is transplanted before the fruit is harvested.").

### 2. But, the Keefers Did Not Give Away the Entire Asset

However, the Court must still consider the first *Humacid* prong: whether by assigning the 4% interest "subject to an oral agreement" the Keefers "carve[d] . . . a partial interest out of the [assigned] asset." *See Salty Brine I, Ltd, v. United States*, 761 F.3d 484, 491 (5th Cir. 2014). If so, then they retained that partial interest in the asset after the assignment and the anticipatory assignment of income doctrine would apply, as the whole asset was not transferred before the Hotel sale closed

- 17 -

on August 11, 2015. *See id.*; Doc. 69-2, Closing Statement, 20–21. In other words, reverting to

Justice Holmes's metaphor, did the Keefers transplant the *whole* tree on June 18, 2015, when Kevin

assigned the interest to Pi? *See Caruth Corp.*, 865 F.2d at 649.

The Keefers explain that "before Kevin . . . transferred the 4% partnership interest to Pi, the

partnership owed money to the pre-existing partners for pre-donation earnings that had not been

distributed to those pre-existing partners . . . because the partnership, as the owner of the [H]otel,

was required . . . to maintain a certain amount of cash reserves . . . to comply with . . . loan and

franchise obligations." Doc. 71, Pls.' Resp., 14. Kevin testified that the "oral agreement" referenced

in the Appraisal was an agreement between the pre-assignment partners:

> [T]he general partner had made the decision that [the reserve accounts]—since
> those were amounts withheld from earnings prior to the date of the gift, that the
> general partner was going to distribute that to the partners in their percentage of
> ownership prior to that date of the gift. It was his opinion and responsibility to pay
> those reserves in to the partners from the—where the earnings had been prior to—
> held back prior to the June 18th. The—what I told the Pi Foundation is we were
> going to distribute those reserves to a number of re—effectively a distribu—a liability
> at the time of the transfer to the partners. And they had—they acknowledged what
> we were doing and how we were gonna treat it, and so we were sure that the
> [appraisal] valuation was done that way. So that's what—I consider it an oral
> agreement in how we were treating that. We treated it as a liability at the time of the
> transaction, so all those reserves were distribution to the partners prior to June 13[5]
> [sic], that we had a liability to pay them, and that's why they weren't included in the
> valuation.

Doc. 69-1, Keefer Dep., 30.

The cash reserves in question, Kevin testified, were reflected on the partnership's balance

sheet as "equipment reserves" and "working capital reserves." *Id.* at 32. The reason for keeping these

reserves, which had been "reserved from the distributions that [the partnership had] been making

from the partners," was so "if the [H]otel sale didn't go through [the partnership] would have the

---

[5] The Court interprets Kevin's testimony as intending to refer to the June 18, 2015, assignment date.

money to [make future renovations to the Hotel as required by the franchise agreement] because the Pi Foundation could not obviously contribute capital for the renovation," he testified. *Id.* at 34. So, if the Hotel sale occurred and the renovations would not be required "those reserves [would be released as] accrued distribution to those partners prior to the Pi Foundation being admitted." *Id.* However, Kevin testified that the franchise agreement did not require such cash reserves; they were reserved at the discretion of the general partner. *Id.* In sum, the Keefers argue that "[t]he partnership's payment of pre-existing liability to its pre-existing partners is not a 'carving out' from the 4% partnership interest to Pi any more than the partnership paying a liability for a pre-existing light bill is a 'carving out' from some partnership interest." Doc. 74, Pls.' Reply, 4.

The Government responds that "the Keefer's [sic] own appraisal that takes into account their side oral agreement . . . shows that they did not donate a true partnership interest . . . [but] g[a]ve away 4% of the net cash from the sale of one of the Partnership's assets . . . cash the Keefers would have otherwise received from the sale of the [H]otel. This is the classic assignment of income." Doc. 73, Gov't's Reply, 7–8.

The Court cannot agree with the Keefers that the reservation of cash reserve accounts for distribution, post-sale, to pre-June 18 partners did not carve out a portion of the interest Pi received. According to Kevin's testimony, the "reserve accounts" were funds that the general partner chose to maintain for compliance with "loan and franchise agreements" and that had been withheld from partner distributions at the discretion of the general partner. *See* Doc. 69-1, Keefer Dep., 30, 32, 34. Per his testimony, they were not liabilities like a *pre-existing* light bill. *See id.* Instead, they were a reserve of cash held back to address *future* potential liabilities. *See id.*

Thus, as described by Kevin, the cash reserves fall within the Partnership Agreement's

definition of "Available Cash Flow," which is set forth in the Appraisal. *See* Doc. 69-1, Appraisal, 207 (defining "Available Cash Flow" to include "any other funds, including, but not limited to, amounts previously set aside as reserves by the General Partner, deemed advisable in the discretion of the General Partner, for distribution as cash flow"). And per the Appraisal's recitation of the Partnership Agreement's provisions, "Available Cash Flow, if any, in each calendar quarter of a partnership year shall be allocated to and distributed among the Partners pro rata . . . at such time as the General Partner determines, but in no event later than thirty (30) days after the close of such calendar quarter of the Partnership year." *Id.* at 208. As Marshall noted: "The Agreement provides that available cash flow shall be distributed to the Partners." *Id.* at 209.

By contrast, the Appraisal indicates that, pursuant to the "oral agreement," the interest donated to Pi would not be subject to the Partnership Agreement's Available Cash Flow provisions but to an alternative arrangement:

> On June 18th, 2015, the donor transferred a 4.000% limited partnership interest in the Partnership to the Pi Foundation. By oral agreement, the Foundation and Donor agreed that the Foundation *would only share in the proceeds from Seller's Closing Statement; the Foundation would not receive its pro rata share in other net assets of the Partnership.*

*Id.* at 209 (emphasis added).

Regarding this oral agreement, Kevin testified that upon the Hotel's sale, the partnership intended to take the sale proceeds, deduct the reserve funds from the proceeds and pay them out in shares to the pre-June 18 partners but not to Pi, and then disburse to Pi its 4% share of the remaining net proceeds. *See id.* He also testified that the donated interest as described in the Appraisal "is what [Pi] received." Doc. 69-1. Keefer Dep., 35.

Based on this evidence, the Court finds that no genuine issue of material fact exists as to whether the Keefers carved out a portion of the 4% partnership interest before donating it to Pi. They did. After the assignment, Pi did not have the right that other partners had to share in a distribution of Available Cash Flow as described in the Partnership Agreement, but only had a right to share in the net proceeds of the Hotel sale. *See id*. at 35; Doc. 69-1, Appraisal, 209 (noting that "the Foundation would only share in the proceeds from Seller's Closing Statement; the Foundation would not receive its *pro rata* share in other net assets of the Partnership"). Or, in the unlikely event the Hotel sale had not been completed as planned, Pi would not have shared equally with the other limited partners in the duty to contribute funds for renovation, should additional funds be required to fulfill the partnership's obligations under the loan or franchise agreements. *See* Doc. 69-1, Keefer Dep., 34 (noting that the pre-assignment reserves were needed because "the Pi Foundation could not obviously contribute capital for the renovation"). Reflecting this carve out, the Appraisal calculated a lower value for the donated interest than for a full 4% interest in all of the partnership's assets. Doc. 69-9, Appraisal, 594 ("All assets not included in the $54 million [sale price] have been excluded."); *id*. at 595 (calculating 4% of net sale proceeds without reserves). Accordingly, the Keefers did not donate their full 4% partnership interest on June 18, 2015, but donated only a portion thereof. They did not transplant the *whole* tree.

The anticipatory assignment of income doctrine therefore applies to this transaction.

D.   *The Government Properly Denied the Keefers' Charitable Contribution Deduction Because They Did Not Obtain a CWA Meeting the Requirements of Section 170(f)(8) and (18)*

Next, and independent from the above anticipatory assignment of income analysis, the Court must determine whether the IRS erred in disallowing the Keefers' charitable deduction for the donation. The Court finds that the IRS correctly disallowed the Keefers' charitable contribution

because they did not obtain a CWA satisfying the requirements of 26 I.R.C. §§ 170(f)(8) and (18).

Section 170(f)(8) provides that a charitable deduction "for any contribution of $250 or more" shall not be allowed "unless the taxpayer substantiates the contribution by a [CWA] of the contribution by the donee organization that meets the requirements of subparagraph (B)." 26 I.R.C. § 170(f)(8)(A). Subparagraph B requires in relevant part that a CWA state: (1) "The amount of cash and a description (but not value) of any property other than cash contributed"; and (2) "Whether the donee organization provided any goods or services in consideration, in whole or in part, for [the donated property.]" *Id.* § 170(f)(8)(B)(i–ii). A donation to a donor advised fund must also comply with § 170(f)(18), which requires:

> A deduction . . . for any contribution to a donor advised fund . . . shall only be allowed if . . . the taxpayer obtains a [CWA] (determined under rules similar to the rules of paragraph (8)(C)) from the sponsoring organization . . . of such donor advised fund that such organization has exclusive legal control over the assets contributed.

*Id.* § 170(f)(18).

Importantly, "[t]he doctrine of substantial compliance does not apply to excuse compliance with the substantiation requirements of section 170(f)(8)(B)." *Averyt v. Comm'r*, 2012 WL 2891077, at *4, (T.C. July 16, 2012) (citing *Durden v. Comm'r*, 2012 WL 1758655, at *4 (T.C. May 17, 2012)). Strict compliance is required. *See id.*

The Keefers claim that they obtained a statutorily compliant CWA, including Pi's acknowledgment that it had full and exclusive legal control over the donated property. Doc. 65, Pls.' Br. Am. Mot., 16. They assert that "PI prepared two documents[,] . . . [the] one page [Acknowledgment Letter] dated [September 9][6], 2015, signed by the Executive Director of PI saying PI received the 'donation' and that '[n]o goods or services were provided in exchange' . . . [and the]

---

[6] *See supra* note 2.

12 page [DAF Packet] also on PI letterhead dated June 8, 2015" (collectively, "the Pi Documents"),

containing additional terms of the agreement. *Id.* The Pi Documents, *collectively*, are a statutorily

sufficient CWA, the Keefers argue. *Id.* at 16–19. They argue that the Acknowledgment Letter, which

satisfies § 170(f)(8), is supplemented by the DAF Packet, which proves that Pi exercised exclusive

legal control over the property after the donation and therefore satisfies § 170(f)(18). *Id.*; Doc. 71,

Pls.' Resp., 24.

      The Government responds with several alternative arguments. First, it contends that multiple

documents cannot be combined to constitute a CWA unless the documents contain a merger clause.

Doc. 72, Gov't's Resp., 18. But even if they could be, the Government argues neither the DAF

Packet nor the Acknowledgment Letter contains a statement that Pi had "exclusive legal control."

Doc. 72, Gov't's Resp., 16. The Government argues that this exact language is required to satisfy

§ 170(f)(18). *Id.* at 17. Or, if this specific language is not required, the Pi Documents "still fail[] to

show that Pi had exclusive legal control," it maintains, because the DAF Packet does not include a

merger clause and the interest was transferred subject to an oral agreement that "could wrestle the

purported 'exclusive legal control'" away from Pi and back to the Keefers. *Id.* at 18.

      Below, the Court finds the Keefers did not obtain a statutorily compliant CWA and that their

charitable donation deduction was properly denied on that basis. First, the Court explains why the

June 8, 2015 DAF Packet is not a CWA. Next, the Court explains why the September 9, 2015

Acknowledgment Letter cannot be supplemented by the DAF Packet. Finding that the DAF Packet

cannot supplement the Acknowledgment Letter, the Court does not consider whether the DAF

Packet establishes that Pi had "exclusive legal control" over the donated property. Instead, because

the Acknowledgment Letter alone contains nothing to prove "exclusive legal control," the Court finds that § 170(f)(18) was not satisfied.

### 1.    The June 8, 2015 DAF Packet Is Not a CWA.

Though few courts have addressed this issue, the Court begins with the basic premise that an "acknowledgment" memorializes a gift that has been completed or is legally obligated to occur, not one that is merely contemplated or uncertain to occur. *See Bruce v. Comm'r*, 2011 WL 2600906, *5 (T.C. June 29, 2011). As the Tax Court noted in *Bruce v. Commissioner*—a Tax Court case that is not binding on this Court but is persuasive—"neither Congress nor the Secretary defined the term 'acknowledgment' for purposes of . . . section [170(f)(8)]." *Id*. Therefore, in interpreting § 170(f)(8), "acknowledgment" should be given its "ordinary, contemporary, common meaning." *Id*. (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Pship.*, 507 U.S. 380, 388 (1993)). According to Black's Law Dictionary, the Tax Court continued, "acknowledgment" means "the act of making it known that one *has received* something." *Id*. (quoting *Acknowledgment*, Black's Law Dictionary, (7th ed. 1999)) (emphasis added).[7] Further, requiring that an "acknowledgment" substantiate a completed gift is consistent with Congress's purposes in enacting the CWA requirement, the Tax

---

[7] The *Bruce* court quoted only this single definition of "acknowledgment." *Id*. at *5. However, the quoted edition of Black's Law Dictionary provided several other definitions for the term. For completeness's sake, the Court provides the full set of "acknowledgment" definitions:

> 1. A recognition of something as being factual. 2. An acceptance of responsibility. 3. The act of making it known that one has received something. 4. A formal declaration of an authorized officer, such as a notary public, by someone who signs a document and confirms that the signature is authentic. . . . 5. The officer's certificate that is affixed to the document.

*Acknowledgment*, Black's Law Dictionary (7th ed.1999). In the context of substantiating a gift or donation, this Court, like the *Bruce* court, accepts the third definition as the contemporaneous common meaning of "acknowledgment." *See* 26 I.R.C. § 170(f)(8)(A) ("No deduction shall be allowed under subsection (a) for any contribution of $250 or more unless the taxpayer substantiates *the contribution* by a contemporaneous written acknowledgment *of the contribution* by the donee organization that meets the requirements of subparagraph (B).").

Court reasoned. *Id.* at *5–6 (discussing *Addis v. Commissioner*, 374 F.3d 881, 885 (9th Cir. 2004)'s analysis of H.R. Rep. No. 103–213, at 563–64 (1993) (Conf. Rep.)). "[A]gainst this backdrop" of the statute's plain language and purpose, the *Bruce* court found that the document at issue in that case (a settlement agreement for a donation of a development interest in real property) was not a CWA because it did not substantiate a completed donation or one that was legally obligated to occur. *Id.* at *6.

 *Bruce* is the only prior case that this Court has found discussing whether a pre-donation document can serve as a CWA, so the Court will briefly set out its facts. In *Bruce*, a landowner and a county executed a settlement agreement on August 27, 2004, formalizing a mutual exchange wherein the landowner would give up development rights in his parcel in return for a driveway easement over neighboring county property. *Id.* at *1–2. "The substantive rights and obligations created by the settlement agreement [for each party to transfer its respective interest] . . . were 'subject to and conditioned upon' the county's obtaining approval to dispose of the driveway easement." *Id.* at *6. That easement disposition was approved fifteen months later, in December 2005. *Id.* at *3. On December 22, 2006, the county sent the landowner a letter acknowledging his donation of the development rights. *Id.* And on December 29, 2006, the landowner and the county conveyed the respective interests to one another by reciprocal deeds. *Id.* at *6.

 In the interim, however, the landowner had claimed a charitable contribution deduction for the cost-adjusted basis of the development rights on his 2004 tax return, filed in October 2005. *Id.* Relevant to this case, when the IRS denied the deduction, the landowner claimed that the August 27, 2004 settlement statement satisfied § 170(f)(8)'s CWA requirement because it "'legally obligated' [him] to donate his development rights," and acknowledged that obligation. *See id.* Rejecting that

argument, the Tax Court noted that "the county could not have acknowledged receipt of [the landowner's] development rights as of August 27, 2004, because . . . the obligations of [the landowner] under that agreement had not matured." *Id.* at *7.

While the time gap between the pre-donation "acknowledgment" and Kevin's assignment of the interest is not so large here as in *Bruce*, the principle is the same. Based on the plain text and the contemporaneous common meaning of "acknowledgment," the intended function of this IRS substantiation requirement, and the text of 26 I.R.C. § 170(f)(8)(A), which states that a charitable deduction shall not be allowed "unless the taxpayer substantiates *the contribution* by a contemporaneous written acknowledgment *of the contribution* by the donee organization that meets the requirements of subparagraph (B)," 26 I.R.C. § 170(f)(8) (emphasis added), the Court holds that a CWA acknowledges a completed contribution or one that is legally obligated to occur.

Here, the summary-judgment evidence shows, as a matter of law, that the DAF Packet did not complete the donation or legally obligate Kevin to donate the interest to Pi. While the DAF Packet stated that "Kevin . . . hereby transfers as an irrevocable gift to [Pi] . . . the [4.00% partnership interest]," Doc. 66, DAF Packet, 38, the actual assignment did not occur when Kevin signed the DAF Packet documents on June 8, but ten days later. Doc. 69-5, Assignment Int. Further, the DAF Packet's cover letter states in relevant part: "It is [Pi's] understanding that you *intend* to donate to [Pi] 4.00% of interest in Burbank . . . . you agree that if 4.00% of interest in Burbank . . . is not donated to [Pi] for any reason, you will be responsible for paying the [Pi's] legal fees and costs associated with your *anticipated* donation." Doc. 69-1, DAF Packet, 84 (emphasis added). This establishes that, by signing the DAF Packet, Kevin was not legally obligated to complete the donation; rather, he was only legally obligated to pay Pi's legal expenses whether the donation

occurred or not. *See id*; Doc. 69-5. Assignment Int. So, the DAF Packet is not a CWA because it did not *acknowledge* a contribution. *See* 26 I.R.C. § 170(f)(8)(A).

2.    The June 8, 2015 DAF Packet Cannot Supplement the September 9, 2015 Acknowledgment Letter.

Having determined that the DAF Packet is not a CWA, the Court must next consider whether the DAF Packet can supplement the September 9, 2015 Acknowledgment Letter. It cannot, for the reasons explained below.

The Keefers cite *Averyt*, 2012 WL 2891077, for the proposition that "[l]etters from the donee to the donor can be considered together to decide whether the required acknowledgment has be[en] made." Doc. 65, Pls.' Br. Am. Mot., 15. They also cite *Estate of Hudgins v. Commissioner*, 57 F.3d 1393, 1405 (5th Cir. 1995) for the premise that statutory substantiation requirements can be satisfied by attaching "the named document 'or some reasonable facsimile thereof' 'or other contractually sufficient substitute'" to the tax return. Doc. 74, Pls.' Reply, 8–9. The Keefers argue that the DAF Packet "contains 5 exhibits that are specifically incorporated by reference [into the June 8, 2015 letter from Pi] and are therefore plainly integral parts of the requisite [CWA]." *Id.* at 9.

The Government responds that multiple documents can be read together as a CWA only if they contain a merger clause, citing *French v. Commissioner*, 2016 WL 1160152 (T.C. Mar. 23, 2016). Doc. 72, Gov't's Resp., 18. Neither the DAF Packet nor the Acknowledgment Letter contains a merger clause, the Government notes. *Id.* And "[w]ithout this merger clause, the IRS must guess whether another document exists that could wrestle the purported 'exclusive legal control' from [the donee] and transfer it to [the donor]." *Id.*

The Keefers reply that the Government's belief that a merger clause is dispositive is misplaced, since the Keefers' argument is that the Acknowledgment Letter *should* be read together

with the DAF Packet, not the reverse. Doc. 71, Pls.' Resp., 24 n.1 ("The absence of a merger clause here proves the opposite of what [the Government] argues—it is evidence the parties did not intend for the latest document to exclude any other document, including the [June 8, 2015 DAF Packet] [CWA] of Pi here.").

The Court has carefully examined each of the cases cited by the parties and finds that none of them supports the Keefers' assertion that the DAF Packet may supplement the Acknowledgment Letter to constitute a CWA satisfying §§ 170(f)(8) and (18).

*Averyt* and *French* each involved the donation of a conservation easement. In *Averyt*, the court held that a letter acknowledging a conservation easement donation was not a CWA because it did not state what portion of the donation was deductible and (incorrectly) indicated that some benefit was provided to the donor in exchange. *See Averyt*, 2012 WL 2891077, at *4. However, the court found that the conservation easement deed itself was a CWA, even though it did not state that "no goods or services were provided" for the donation:

> [T]he conservation deed was signed by a representative from [the donee organization], provided a detailed description of the property and the conservation easement, and was contemporaneous with the contribution. Additionally, the conservation deed in the instant case states that the conservation easement is an unconditional gift, *recites no consideration received in exchange for it, and stipulates that the conservation deed constitutes the entire agreement between the parties with respect to the contribution of the conservation easement.* Accordingly, the conservation deed, taken as a whole, provides that no goods or services were received in exchange for the contribution. Consequently, we conclude that . . . the conservation deed in the instant case satisfies the substantiation requirements of section 170(f)(8).

*Id.* at *5 (emphasis added).

In *French*, taxpayers who did not receive a contemporaneous letter acknowledging their conservation easement donation similarly attempted to rely on their conservation easement deed as a CWA. *French*, 2016 WL 1160152, at *4. As in *Averyt*, the deed did not state that "no goods and

services were received in exchange" for the donation. *Id.* But unlike in *Averyt*, the deed did not contain a merger clause stating that it was the entire agreement between the parties. *Id.* "Without such a provision," the court concluded, "the IRS could not have determined by reviewing the conservation deed whether petitioners received consideration in exchange for the contribution of the conservation easement . . . [and] the conservation deed taken as a whole is insufficient to satisfy section 170(f)(8)(B)(ii)." *Id.* Therefore, the court denied the charitable donation deduction. *Id.*

These cases stand for the proposition that a deed can serve as a *de facto* CWA so long as "the deed taken as a whole . . . prove[s] compliance with section 170(f)(8)(B)(ii)." *French*, 2016 WL 1160152, at *4 (first citing *RP Golf, LLC v. Comm'r*, 2012 WL 4663277, at *4 (T.C. Oct. 3, 2012); and then citing *Averyt*, 2012 WL 2891077, at *4–5); *see also Albrecht v. Comm'r*, 2022 WL 1664509, *2–3 (T.C. May 25, 2022) (considering whether a deed of gift could serve as a CWA); *Izen v. Comm'r*, 148 T.C. 71, 78 (2017) ("[W]e have held that a deed of gift can serve as a de facto CWA so long as it is 'contemporaneous' and contains all of the information required by section 170(f)(8)(B)."). Neither party has provided a case extending this holding outside the context of deeds and the Court is not aware of any such case.

If these cases *can* be applied to documents other than deeds—which by their nature, substantiate a completed transfer of interest—they suggest that a court might consider outside documents to supplement an otherwise-deficient CWA so long as the plain text of the CWA directs and limits the inquiry. *Cf. French,* 2016 WL 1160152, at *4 ("[T]he deed taken as a whole must *prove* compliance." (emphasis added)); *Izen*, 148 T.C. at 78; *Albrecht*, 2022 WL 1664509, at *3

(noting that the court construes "the plain text of the deed"). *But see Irby v. Comm'r*, 139 T.C. 371 (2012).[8]

Here, as discussed above, only the September 9, 2015 Acknowledgment Letter is a CWA on which to base this inquiry. The body of this letter reads in full:

> Thank you for your donation to The Pi Foundation, Inc. of a 4.00% interest in Burbank HHG Hotel, LP. The Pi Foundation, Inc., is a 501(c)(3) nonprofit organization. Your contribution is tax-deductible to the extent allowed by law. No goods or services were provided in exchange for your generous financial donation. Please keep this page for your records.

69-1, Acknowledgment Letter, 98.

Critically, the Acknowledgment Letter does not incorporate by reference or otherwise refer to the DAF Packet. *See id.* It does not reference the Keefer DAF at all, state that the donated interest is destined for any DAF, or even state that Pi is a provider of DAFs. *See id.* Therefore, the text of the Acknowledgment Letter does not provide the Court *any* basis on which to incorporate the DAF Packet's provisions.[9]

---

[8] Neither party cited *Irby*, in which the Tax Court found that "collectively, the documents [taxpayers] provided constitute[d] a [CWA]." 139 T.C. at 389. The documents at issue in *Irby*, which involved a bargain sale of a conservation easement, were: (1) "Option Agreements for the Purchase of a Conservation Easement, dated September 26, 2003"; (2) "Forms 8283 attached to [the sellers'] respective 2003 and 2004 income tax returns . . . [and] signed by the president of [the donee organization]"; (3) "[S]ettlement statements prepared by . . . the title company" and signed by the sellers and the donee organization; and (4) The deeds for the easements. *Id.* at 388. Importantly, each of the documents considered as part of the CWA in *Irby* appear to have been obtained at the time the sellers became legally obligated by the Option Agreements to complete the transaction if the donee exercised its option, or after that date. *See id.* at 374. So, each of the documents considered in *Irby* was itself an "acknowledgment" of the donation under the rule set out by the Court above, a distinction which might make a difference. Regardless, this Court declines to follow the *Irby* approach and instead adopts the plain-text-limited approach employed by a majority of courts to have considered such cases. *See French*, 2016 WL 1160152, at *4; *Averyt*, 2012 WL 2891077, at *4–5; *Albrecht*, 2022 WL 1664509, *2–3; *Izen*, 148 T.C. 71, 78.

[9] The Court agrees with the Keefers that the absence of a merger clause is not dispositive here because the Keefers seek to incorporate by reference the terms of the DAF Packet, not exclude the possibility of other prior agreements. *See* Doc. 71, Pls.' Resp., 21 n.1. However, if the Acknowledgment Letter did incorporate by reference or otherwise refer to the Keefer DAF or the DAF Packet, potentially bringing that

So, the Court cannot read the DAF Packet together with the Acknowledgment Letter but must consider whether the Acknowledgment Letter alone proves compliance with each requirement of § 170(f)(8) and (18). As the Keefers admit, their tax advisor testified, and the IRS reviewer noted, the Acknowledgment Letter proves compliance with § 170(f)(8) but does not prove that Pi received exclusive legal control as § 170(f)(18) requires. *See* Doc. 71, Pls.' Resp., 24 (arguing that the DAF Packet establishes exclusive legal control); Doc. 66, IRS Checklist, 69 (indicating no statement of exclusive legal control); Doc. 69-3, Horowitz Dep., 341 (stating that the one-page CWA was "the acknowledgment required by Section 170(f)(8) of the [C]ode" and the DAF Packet was the acknowledgment issued "[i]n accordance with Section 170(f)(18)"). Therefore, because the Acknowledgment Letter does not reference the Keefer DAF or otherwise affirm Pi's exclusive legal control, as required by § 170(f)(18), the Keefers did not obtain a CWA satisfying *each* statutory requirement.

### 3.    Section 170(f)(18)(B) Requires Strict Compliance

The Keefers' *Hudgins* substantial compliance argument also fails, as these CWA provisions require strict compliance. *Cf. Albrecht*, 2022 WL 1664509, at *2; *Averyt*, 2012 WL 2891077, at *4. The Keefers argue that § 170(f)(18)(B)'s "only requirement is that there be an acknowledgment, in writing, in some form or fashion that acknowledges the fact that the charity has exclusive legal

---

agreement's provisions into the September 9, 2015 CWA, then the presence of a merger clause might be important for the Court's determination of whether the oral agreement "wrestled" some legal control away from Pi as the Government argues. *See* Doc. 72, Gov't's Resp., 18; *see also Albrecht*, 2022 WL 1664509, at *3 (disallowing a charitable deduction where the deed of gift contained a reference to a prior agreement). *But see Fairbairn v. Fid. Invs. Charitable Gift Fund*, 2020 WL 999752, at *2 (N.D. Cal. Mar. 2, 2020) (quoting *Fund for Anonymous Gifts v. I.R.S.*, 1997 WL 198108 (D.D.C. Apr. 15, 1997) (emphasis in original) (distinguishing conditions precedent to a gift to a DAF from "enforceable conditions *subsequent* which a donor places on his donation")).

control of the contributed asset . . . after the donation." Doc. 74, Pls.' Reply, 8. But this is not what the Tax Code says. As noted above, § 170(f)(18) provides that:

> A [charitable] deduction . . . for any contribution to a donor advised fund . . . shall only be allowed if . . . (B) the taxpayer obtains *a contemporaneous written acknowledgment (determined under rules similar to the rules of paragraph (8)(C))* from the sponsoring organization (as so defined) of such donor advised fund that such organization has exclusive legal control over the assets contributed.

26 I.R.C. § 170(f)(18) (emphasis added).

By its plain text, § 170(f)(18)(B) supplements and cross references the CWA requirements of § 170(f)(8), which require strict compliance. *See Averyt,* 2012 WL 2891077, at *4; *Albrecht*, 2022 WL 1664509, at *2. Therefore, the Court holds that § 170(f)(18)(B) likewise requires strict compliance. *Hudgins*, a case discussing the possibility of substantial compliance with an entirely different provision of the Tax Code, is thus inapposite. *See* 57 F.3d at 1406 (discussing 26 I.R.C. § 2032A(d)(1)).

However, strict compliance with § 170(f)(18)(B) does not mean that the exact words "exclusive legal control" must appear in the CWA, as the Government argues. *See* Doc. 68, Gov't's Br., 27. Instead, it means that the CWA must prove that the "organization has exclusive legal control," which might be accomplished without that specific language. *Cf. Schrimsher v. Comm'r*, 2011 WL 1135741, at *2 (T.C. 2011) (quoting H.R. Rep. No. 103–213, at 565 n.32 (1993) (Conf. Rep.) ("The contemporaneous written acknowledgment 'need not take any particular form' . . . [but] must include [the statutorily required] information.").

Here, as the Court has explained above, the only CWA the Keefers obtained completely fails to address legal control over the donated property. So, the CWA does not contain the information

required by § 170(f)(18)(B). The IRS properly denied the deduction for this reason. *See* Doc. 66, IRS Checklist, 71 (indicating "not met" as to the exclusive legal control requirement).

Finally, because the Court finds that disallowance of the deduction was justified on the basis of the CWA alone, it does not address whether the Keefers satisfied or substantially complied with the qualified-appraisal requirement. *C.f. Schrimsher*, 2011 WL 1135741, at *4 ("For the reasons explained above, we conclude and hold that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law disallowing the disputed deductions for petitioners' failure to obtain a contemporaneous written acknowledgment . . . . In the light of this conclusion, it is unnecessary to address respondent's alternative contention that petitioners failed to satisfy the requirements of section 170(f)(11).").

E.     *The Keefers Are Not Entitled to a Refund of Tax Paid for 2015*

According to the calculations performed by the Government's expert, Agent Dunford, the Court's two independent decisions above on the issues of anticipatory assignment of income and denial of the charitable deduction result in a scenario under which the Keefers are not entitled to a refund of tax paid for 2015. *See* Doc. 69-10, Dunford Decl., 2, 20–36 (Scenario 2); Doc. 64, Pls.' Am. Mot., 1 (moving for the amounts shown by the Government's calculations under Scenarios 1, 3, and 4); Doc. 65, Pls.' Br. Am. Mot., 27, 29 (describing Agent Dunford's calculations for the tax scenarios as "undisputed summary judgment evidence"). Accordingly, the Court finds that no genuine issue of material fact precludes summary judgment that the Keefers are not entitled to a refund of income tax paid for 2015. *See* Doc. 69-10, Dunford Decl., 2, 20–36 (Scenario 2).

IV.

CONCLUSION

For the reasons given above, the Court concludes that no genuine issue of fact remains in this case and that summary judgment should be granted in part and denied in part for each party, as follows.

As to Plaintiffs' Amended Motion for Summary Judgment (Doc. 64):

- Because the IRS properly denied the Keefers' charitable deduction for lack of a CWA, the Court **DENIES** the Keefers' Claim 1 for a refund of $507,964.80. *See* Doc. 65, Pls.' Br. Am. Mot., 1.

- Because the attempted donation was an anticipatory assignment of income and the charitable deduction was properly denied, the Court **DENIES** the Keefers' Alternative Claim 2 for a refund of at least $327,520.00. *See id.* at 3.

- Because the anticipatory assignment of income doctrine applies and the charitable deduction was properly denied, the Keefers are not entitled to a tax refund even if the basis of their donation is recalculated. *See* Doc. 69-10, Dunford Decl., ¶ 7. Therefore, the Court **DENIES** the Keefers' Alternative Claim 3 for a refund of at least $136,875.00. *See* Doc. 65, Pls.' Br. Am. Mot., 4.

- Because the doctrine of variance does not bar the Court from considering the Keefers' Alternative Claims 2 and 3, the Court **GRANTS** summary judgment for the Keefers on Claim 4. *See id.*

As to the Government's Amended Motion for Summary Judgment (Doc. 67), for the same reasons listed above, the Court **DENIES** summary judgment as to the defense of variance and

**GRANTS** summary judgment that the Keefers are not entitled to the refund they seek.


    SO ORDERED.

    SIGNED: July 6, 2022.


    JANE J. BOYLE
    UNITED STATES DISTRICT JUDGE